# Illinois Official Reports

## Appellate Court

---

### *People v. Ortiz*, 2017 IL App (1st) 142559

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BERNARDO ORTIZ, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2559 |
| Filed | February 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-7794; the Hon. Erica L. Reddick, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Peter Sgro, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Justice Reyes concurred in the judgment and opinion.<br>Presiding Justice Gordon specially concurred, with opinion. |

**OPINION**

¶ 1    Defendant Bernardo Ortiz was convicted by a jury of attempted first degree murder, armed robbery, and aggravated vehicular hijacking. He was sentenced to natural life in prison as a habitual offender.

¶ 2    On appeal, he challenges the trial court's rulings that (1) denied his motion to suppress the victim's lineup and in-court identifications as unduly suggestive, (2) denied his motion to allow expert witness testimony on the issue of the reliability of eyewitness identifications, and (3) denied a defense jury instruction regarding eyewitness identifications.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.

## I. BACKGROUND

¶ 5    Defendant was arrested in 2012, after his DNA sample matched DNA recovered from the vehicle of the victim, Dr. Timothy Bollinger, who was stabbed and robbed in his garage on October 3, 2010. At the time of his arrest, defendant was described as a 38-year-old white Hispanic male, 5 feet 11 inches tall, and weighing 180 pounds. Defendant was charged with attempted first degree murder, armed robbery, aggravated vehicular hijacking, burglary, and aggravated battery.

¶ 6    At the April 2014 jury trial, the State's evidence showed that on the evening of the offense, Bollinger left work in Lake Geneva, Wisconsin, and drove to his home on West Iowa Street in Chicago. Around midnight, he stopped at the stop sign at the intersection by his home and saw a man standing there with a dog. Bollinger waited to ensure the man was not trying to cross the street and then drove through the intersection and turned into the alley behind his house. He parked his SUV in his garage, exited the SUV, and threw some trash in a bin. He walked around the SUV and pressed a button to close the garage door. He heard a noise in the alley, so he stood and waited to ensure the door would close. He saw someone's foot move under the garage door, which activated the sensor and caused the garage door to open. The man with the dog was standing at the garage door. Bollinger could see because the garage was illuminated by the light of the overhead garage door motor box.

¶ 7    The man entered and asked if Bollinger could help him. Bollinger told the man to leave, swore, and called to his wife, who was inside the house. The man told Bollinger not to yell, rushed at him with an 8- to 10-inch knife, and stabbed him. Bollinger fell to the ground and was stabbed in his abdomen, thigh, and elbow a total of seven times. The man kneeled beside Bollinger and placed the knife to his throat. While Bollinger looked at the man's face, the man said it was Bollinger's lucky day because the man was not going to kill him. The man demanded Bollinger's wallet, money, and keys, and Bollinger reached into the pocket of his jeans and surrendered those items. Bollinger remained on the ground, lying on his left side in a bent position to put pressure on his wounds and slow his blood loss. From this position, Bollinger was facing the man and had a full view of the entire garage. He watched the man the entire time he was in the garage. The man had trouble using the remote to unlock the doors of the SUV, so Bollinger had to tell him which button to push. The man put the dog in the SUV and then entered the vehicle himself. As the man left, he told Bollinger he would leave the SUV near a hospital and to wait 10 minutes before getting up.

- 2 -

¶ 8    As soon as the man drove off, Bollinger got up, went inside his house, and called to his wife to telephone 911. Mrs. Bollinger and her brother followed Bollinger's first aid instructions while they waited for the paramedics and police.

¶ 9    While Bollinger was in the ambulance being treated by the paramedics, they asked for his license plate number, and Bollinger provided that information. Officer Noel Lopez arrived at the scene and obtained information concerning the attack. At the trial Lopez could not recall whether he actually spoke at the scene with Bollinger, who had sustained serious injuries and was transported to the hospital for emergency surgery. Lopez testified he obtained a description from either Bollinger or his wife, either at the scene or the hospital, that the offender was a medium-complexioned black male, 160 pounds, about 5 feet, 10 inches tall, between 25 to 30 years old, and wore a pantyhose-like material on his face. At trial, Bollinger testified that he did not recall talking to any police officers on the date of the attack and denied giving a description on the date of the attack that the offender either was a medium-complexioned black man or wore a pantyhose-like material over his face. Bollinger explained that the attacker's hair was covered by a black nylon material. The attacker pulled that hair covering down over his face either when he stabbed Bollinger or hovered over him and held the knife to his throat.

¶ 10    The day after the attack, the police found Bollinger's SUV less than a mile from his home and three blocks from Norwegian American Hospital. The location of the SUV also was only two blocks from defendant's home. The SUV was parked with the front tire turned in against the curb and the back end of the vehicle sticking out into the street. The SUV was locked, and the police went to the hospital and obtained keys from Mrs. Bollinger to open it. Evidence technicians processed the SUV for DNA and fingerprints. The SUV had blood-like stains on the exterior driver's side door handle, the driver's side armrest, the front middle armrest, the gearshift lever, the steering wheel, and the exterior passenger's side door handle. No latent fingerprints were recovered, and the swabs were not tested for DNA until September 2011 because many other cases were pending and cases treated as property crimes received a lower priority for testing.

¶ 11    On October 8, 2010, Bollinger was released from the hospital and recuperating from his injuries at home. The next day, Detective Catherine Rolewicz came to his home and talked to him. At that time, Bollinger described his attacker, *inter alia*, as a "light-skinned black." Moreover, the attacker wore a pantyhose-like material on his head and/or over his face so Bollinger could not see his hair.

¶ 12    In October 2011, the police were informed that a match had been found between defendant's DNA and the DNA evidence recovered in Bollinger's SUV. Detective Rolewicz prepared a photo array of six photos that were black and white and printed on paper. The array included defendant's photo. Because defendant was identified as Hispanic, Detective Rolewicz chose photographs of Hispanic or Latino men who, like defendant, had facial and head hair. The photo of defendant showed him having longer hair than the other men in the array.

¶ 13    Detective Rolewicz went to Bollinger's home on January 22, 2012, and handed him the stack of photos. Each photo was given a number, one through six, and defendant's photo was marked as number one and was the first photo in the stack. Detective Rolewicz did not tell Bollinger there was a DNA match from the evidence recovered from his SUV. Bollinger spread the photos out on his kitchen table. He quickly eliminated four of the photos as suspects.

Defendant's photo was one of the two remaining photos. Bollinger thought defendant's photo looked like the attacker based on his facial features. Concerning the other remaining photo, Bollinger selected it only because the man's skin tone seemed a little darker than defendant's skin tone in the photo, but the skin tones were hard to discern from those printed black and white photos. Bollinger did not make a positive identification from the photo array and thought the police would conduct a lineup. Bollinger told Detective Rolewicz he thought the offender was a light-complexioned black man but could have been Hispanic.

¶ 14    In March 2012, Bollinger viewed a lineup at the police station of five males, including defendant. The other four participants in the lineup were Hispanic males with similar characteristics to defendant. All the lineup participants wore a black knit cap to cover their various hair styles and cause Bollinger to concentrate on their facial features. Bollinger positively identified defendant in the lineup as his attacker. At trial, Bollinger testified that, at the lineup, he recognized a deformity on defendant's nose, which Bollinger had noticed at the time of the attack; however, Bollinger acknowledged that he did not mention that deformity before the trial.

¶ 15    The DNA analysis established that the mixture of DNA found on the driver's side door handle could have been blood mixed with any other biological source, like skin or saliva cells. Two DNA profiles were identified from the swabs of the driver's side door handle and steering wheel. Bollinger was assumed to be the source of one of the profiles based on the case information, and the other profile matched defendant's profile, which one could expect to find in 1 in 11 quintillion blacks, 1 in 19 quintillion whites, and 1 in 124 quadrillion Hispanics. A partial DNA profile was identified from the swab of the gearshift lever, and defendant could not be excluded from that partial profile, which one could expect to find in 1 in 13 blacks, 1 in 27 whites, and 1 in 5 Hispanics.

¶ 16    The jury found defendant guilty of attempted murder, aggravated vehicular hijacking, and armed robbery. He was sentenced to natural life in prison as a habitual offender.

¶ 17                                    II. ANALYSIS

¶ 18    On appeal, defendant asks this court to overturn his conviction based on any one of three alleged errors. First, he argues the trial court improperly denied his motion to suppress Bollinger's identifications of defendant because the photo array and subsequent lineup were unduly suggestive. Second, defendant argues the trial court improperly denied his motion to allow expert witness testimony concerning the reliability of eyewitness identifications. Third, defendant argues the trial court improperly denied one of his jury instructions regarding eyewitness identifications.

¶ 19                            A. Identification Testimony

¶ 20    Defendant contends the trial court erred in denying his motion to suppress Bollinger's identification testimony. Defendant argues the suggestive photo array infected the improperly conducted and suggestive lineup, and there was no way to purge the taint of those suggestive pretrial identification procedures from Bollinger's in-court identification of defendant as the attacker. Defendant argues that, as a white Hispanic, he did not match Bollinger's original description of the attacker as a black man, and Bollinger did not say his attacker could have been Hispanic until after Bollinger viewed the photo array, which consisted entirely of Hispanic men.

¶ 21    A trial court's factual determination that an identification procedure was not unduly suggestive should not be reversed unless it is against the manifest weight of the evidence, *i.e.*, an opposite conclusion is apparent or the findings appear to be unreasonable, arbitrary, or not based on evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006); *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). However, the ultimate determination of whether the trial court's suppression ruling was proper given the factual circumstances at issue is a legal question, which we review *de novo*. *Luedemann*, 222 Ill. 2d at 542.

¶ 22    The defendant bears the burden of proving that a pretrial identification was impermissibly suggestive. *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). The court employs a two-prong test to determine whether a witness's identification was so tainted by suggestive identification procedures that its admission at the defendant's trial violated due process. *People v. McTush*, 81 Ill. 2d 513, 520-21 (1980). First, the court must determine whether the pretrial identification procedures were suggestive; if so, then the court must determine whether the identification testimony was so tainted as to make it unreliable. *Id.* In evaluating the reliability of the tainted identification, the court considers (1) the witness's opportunity to view the suspect during the offense, (2) the witness's degree of attention, (3) the accuracy of any prior descriptions given, (4) his level of certainty at the time of the identification, (5) the length of time between the crime and the identifications, and (6) any prior acquaintance with the person identified that would enhance the witness's ability to recognize him. *Id.* at 521.

¶ 23    Regarding the photo array, defendant argues it was improperly conducted because Detective Rolewicz knew defendant was a suspect when she conducted the photo array and may have, consciously or unconsciously, suggested that information to the witness through nonverbal cues like voice tone, pauses, demeanor, facial expressions, and body language. Defendant also claims his photo was so dissimilar from the photos of the other five men that the array essentially hung a sign around defendant's neck that said "pick me." Specifically, defendant argues his photo showed him with longer, slightly unkempt hair whereas the other five men had short, tightly cropped hair. Also, defendant wore a solid dark T-shirt whereas the other men wore hooded sweatshirts, a plaid shirt, or T-shirts bearing graphics.

¶ 24    Regarding the lineup, defendant claims the procedure was improper because the detective conducting the lineup knew defendant was a suspect. Furthermore, Bollinger's viewing of defendant's photo in the improperly suggestive photo array infected the lineup proceeding, where defendant was the only participant to have been in both the photo array and lineup. Defendant also claims he was the only participant in the lineup who had prominent facial hair.

¶ 25    We find no error in the trial court's denial of defendant's motion to suppress because the pretrial procedures were not unduly suggestive. Detective Rolewicz testified that she assembled the photo array by using a lineup database program and selecting search factors like defendant's race, ethnicity, hair color, eye color, weight, height, or age so that the other men in the array would look similar to him. All the men in the photo array were either Hispanic or Latino with facial hair and hair on their heads. Our review of both the photo array and the photograph of the lineup contained in the record confirms that all the men were similar in appearance. The participants in a lineup or photo array should not appear grossly dissimilar to the suspect. *People v. Maloney*, 201 Ill. App. 3d 599, 606-07 (1990) (lineup was unduly suggestive where, in addition to the weight and size differences between the defendant and the participants, the defendant appeared unkempt and disheveled in wrinkled, soiled clothing, shoes without socks, and uncombed hair, whereas the other four participants were

well-groomed and well-dressed in clean pressed clothing, wristwatches, and footwear with socks). The law, however, does not require the participants in a photo array or lineup "to be identical or near identical." *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57 (lineup was not unduly suggestive where the defendant was the only person wearing a sleeveless T-shirt, which a witness had described the offender as wearing, and the defendant had a somewhat more muscular physique than the other participants); *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) (lineups were not unduly suggestive where the defendant was the only person with an Afro hairstyle in one lineup and French braids in another lineup).

¶ 26     When Detective Rolewicz conducted the photo array and another detective conducted the lineup, they knew the police had been alerted that there was a match between defendant's DNA and the DNA evidence recovered from Bollinger's SUV. However, they testified that they did not mention this information to Bollinger before the photo array and lineup, and nothing in the record suggests the police directed Bollinger's attention to defendant or suggested in any manner that he was the offender. To the contrary, all the lineup participants wore black knit caps so that defendant's long hair would not stand out and Bollinger would concentrate on the participants' facial features. Furthermore, prior to viewing the lineup, Bollinger signed a lineup advisory form that informed him the police did have a suspect in custody but the suspect may or may not be in the lineup Bollinger was about to view. Also, the mere fact that defendant was the only person in both the photo array and the lineup does not render the lineup suggestive. *People v. Johnson*, 149 Ill. 2d 118, 148 (1992). Bollinger did not make an identification from the photo array, indicating he was not willing to make a positive identification until he was certain the person was his attacker.

¶ 27     Defendant was not grossly dissimilar from the other participants in the photo array and lineup, and any differences in appearance between him and the other men were minor. Neither defendant's longer hair nor amount of facial hair nor the color and style of his shirt rendered his appearance grossly dissimilar to the other participants. Moreover, Bollinger had told the police that the attacker wore a tan jacket during the October 2010 offense, and Bollinger could not see the attacker's hair because he wore a black nylon hair covering. Consequently, the offender's hairstyle and shirt were not major factors in Bollinger's identification of his attacker approximately 15 months after the offense. We conclude the trial court did not err in denying defendant's motion to suppress the identification testimony because the identification procedures were not suggestive.

¶ 28                          B. Expert Testimony on Eyewitness Identifications

¶ 29     Next, defendant argues a new trial is warranted because the trial court improperly denied his motion to allow the expert testimony of Dr. Geoffrey Loftus, an experimental psychologist, who has been qualified as an expert witness in over 300 cases on how memory and human perception relate to eyewitness identification. According to the record, the defense had argued Dr. Loftus was qualified to testify about aspects of eyewitness testimony that are not within the life experiences or knowledge of the average juror. Dr. Loftus would not have testified as to whether a particular witness was accurate, but would have explained that human memory is not simply a recording of a perceived event and would have provided information to allow jurors to put eyewitness testimony into context.

¶ 30     A trial court's decision to exclude or admit expert eyewitness identification testimony is reviewed under an abuse of discretion standard. *People v. Lerma*, 2016 IL 118496, ¶ 23

(2016). An abuse of discretion occurs when a trial court's decision is " 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Id.* (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37). When deciding whether to admit expert testimony, the trial court should balance the probative value of the testimony against its prejudicial effect and should "carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *Id.* "Expert testimony addressing matters of common knowledge is not admissible 'unless the subject is difficult to understand and explain.' " *Id.* (quoting *People v. Becker*, 239 Ill. 2d 215, 235 (2010)).

¶ 31       Our supreme court recently addressed the admissibility of expert eyewitness identification testimony in *Lerma*, where the defendant was convicted of the first degree murder of the victim, who was shot to death while sitting on the unlit front steps of his home. *Lerma*, 2016 IL 118496, ¶¶ 5-6. The offense occurred on an evening in May at about 11:20 p.m., while the victim was sitting with a friend. The offender, a man dressed all in black, approached the porch and fired a gun at them. The victim used his body to cover his friend, and the two of them fell to the ground together. The victim was struck several times, and the friend dragged him inside the house. The victim's father asked the victim who had shot him. Both the friend and father testified that the victim responded that "Lucky" had shot him. *Id.* ¶ 5. At the trial, multiple witnesses testified that the defendant, who lived across the street from the victim, was commonly known by the nickname Lucky. The victim's mother testified that the victim and the defendant had been friends for several years and the defendant recently had fought with a member of the victim's family. The evidence of the defendant's guilt consisted solely of two eyewitness identifications: one by the victim, admitted through his father as an excited utterance exception to hearsay, and the second by the victim's friend, who was sitting on the porch with him when the assailant opened fire on them. *Id.* ¶¶ 5-6. Although the friend testified that she knew the defendant, she had only ever seen him from across the street and only once or twice before the shooting. *Id.*

¶ 32       Our supreme court concluded that the expert testimony on eyewitness identifications was relevant and appropriate under the facts of the case, the trial court's exclusion of the expert testimony was an abuse of discretion, and the trial court error was not harmless. *Id.* ¶¶ 26-27, 33. The court recognized that the research concerning eyewitness identifications was "well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.* ¶ 24.

¶ 33       In assessing the relevance and appropriateness of the expert testimony, the court considered (1) the importance of the eyewitness identifications to the State's case, (2) whether the factors identified by the expert as undermining the reliability of eyewitness identifications were present in the case, (3) whether the eyewitnesses were available for cross-examination, and (4) the eyewitnesses' prior familiarity with the suspect. *Id.* ¶ 26. The court stated there was "no question" that expert eyewitness testimony was both relevant and appropriate for this "type of case," which involved two eyewitness identifications that were important to the prosecution as the only evidence of the defendant's guilt. *Id.* Moreover, the presence of factors identified by the expert as undermining the reliability of the identification testimony—like the sudden nighttime attack involving the firing of a gun—were present in the case. In addition, it was impossible to cross-examine the deceased victim's identification, and the friend had a minimal level of familiarity with the defendant prior to the offense. *Id.*

¶ 34    The court also found that the trial court abused its discretion because the primary basis it gave for excluding the expert testimony was the trial court's personal conviction that acquaintance identifications were reliable and belief that the expert's testimony would operate as an opinion on credibility. *Id.* ¶ 28. Thus, the trial court ignored the expert's report that contradicted the trial court's assumptions about acquaintance identifications and "effectively substituted its own opinion on a matter of uncommon knowledge for that of a respected and qualified expert." *Id.* Finally, the court concluded that the error in excluding the relevant and probative expert identification evidence was not harmless because it contributed to the defendant's conviction in a case that lacked any physical evidence linking the defendant to the crime, the other evidence did not overwhelmingly support the defendant's conviction, and the excluded testimony was neither duplicative nor cumulative of other evidence. *Id.* ¶ 33.

¶ 35    We find *Lerma* distinguishable from the instant case. Here, defendant's conviction does not rest solely on the lineup and in-court identifications made by Bollinger. Bollinger first saw the offender under the conditions of nighttime street illumination as the man standing with the dog at the intersection stop sign, and Bollinger stopped and waited to determine whether they would cross the street. Then, as Bollinger waited in the lighted garage to ensure the door would close because he had heard a noise in the alley, the offender caused the door to open back up and approached Bollinger. At that time, the offender's hair was covered, but his face was not. They briefly spoke to each other before the offender rushed at Bollinger and stabbed him. Bollinger fell to the floor and looked at the offender's face as he knelt and hovered over Bollinger, held the knife to his throat, and spoke to him. Bollinger remained on the floor until the offender left, but Bollinger faced the offender that entire time and watched him. Bollinger's testimony indicated that he was alert before the attack, but he acknowledged that the offender covered his face either when he stabbed Bollinger or hovered over him.

¶ 36    Certainly there were some factors in this crime that would make expert testimony on the reliability of eyewitness identifications relevant and appropriate. This nighttime attack did not last long and involved a weapon. The event was stressful, and Bollinger's knife wounds and blood loss were severe. The offender covered his face at some point, and Bollinger did not know his attacker or ever see him prior to the date of the attack. Bollinger's identifications occurred over a year after the attack, and he had some exposure to postevent information.

¶ 37    Nevertheless, unlike *Lerma*, the defense could and did vigorously cross-examine Bollinger about his ability to see his attacker, his inability to identify an offender from the photo array, and the circumstances of the identifications. Furthermore, strong DNA evidence and also circumstantial evidence outside of the identification testimony supported defendant's conviction. When Bollinger's stolen SUV was recovered only a day after the attack, the blood-like stains were consistent with Bollinger's testimony that the offender first put the dog in the SUV and then entered the driver's side of the vehicle. In addition, the offender was familiar enough with the neighborhood to say he would leave the SUV at the nearby hospital, and the SUV was recovered on a somewhat secluded street about a mile from Bollinger's home, three blocks from a hospital, and two blocks from defendant's home.

¶ 38    Defendant argues that without Bollinger's identification testimony, the DNA evidence merely showed that defendant touched Bollinger's SUV sometime between the time of the attack shortly after midnight on October 4, 2010, and the time the SUV was discovered about 1:30 p.m. on October 5, 2010. We disagree. The SUV was locked when the police recovered it. Accordingly, it was extremely unlikely that a trespasser came upon this SUV while it was

unlocked but with the key somehow available and—despite the noticeable exterior and interior blood stains—entered the SUV and touched the blood stains, possibly even drove the SUV, and then locked and left the SUV near a hospital, just as the attacker said he would. The State's DNA evidence linking defendant to this crime was very strong. His DNA profile matched the DNA recovered on the driver's side door handle and steering wheel of the SUV. Moreover, his DNA was mixed with Bollinger's blood on the door handle. In addition, defendant could not be excluded from the partial DNA profile recovered on the gearshift lever.

¶ 39 Furthermore, unlike *Lerma*, there was no expert report submitted by Dr. Loftus in this case. *Id.* ¶ 14. The defense's motion for expert testimony indicated Dr. Loftus would testify about misconceptions regarding eyewitness identifications, the effect of bias, the difficulties in cross-racial identifications, and how memory affects eyewitness identification. He would explain that (1) a witness's high confidence in the identification was not a predictor of accuracy, (2) certain situations like the stress of the event and postevent suggestion could unintentionally influence a witness to reconstruct his memory in a certain fashion, (3) double-blind and sequential procedures were more reliable than the single-blind, simultaneous lineup conducted in this case, (4) double identifications, as happened in this case where defendant was the only person present in both the photo array and lineup, could affect an identification, and (5) the length of time between the original event and the identification has a decaying effect on memory. The record indicates the defense provided the trial court with Dr. Loftus's curriculum vitae and a transcript of his testimony at a motion to suppress identification hearing in another case. Those documents, however, are not included in the record on appeal.

¶ 40 In *Lerma*, the trial court excluded the testimony of the original identification expert as lacking sufficient relevance because the eyewitnesses claimed to have known the defendant prior to the shooting. *Id.* ¶¶ 10, 12. When the defense moved the court to reconsider and presented the report of the replacement expert, which differed significantly from the initial expert's report on the subject of acquaintance identifications, the trial court excluded the replacement expert for the same reason it had excluded the original expert. *Id.* ¶ 16. Our supreme court held this constituted an abuse of discretion because the trial court denied the defendant's request to present relevant and probative testimony from a qualified expert to challenge the State's only evidence against the defendant, and the reasons for the trial court's denial were "expressly contradicted by the expert's report and inconsistent with the actual facts of the case." *Id.* ¶ 32. Those circumstances are not present in the case before us.

¶ 41 Unlike in *Lerma*, the record shows the trial court here conducted a meaningful inquiry into Dr. Loftus's testimony. Specifically, the trial court referred to the transcript from the other case and noted instances when Dr. Loftus testified that some issues regarding eyewitness identifications were matters completely of common sense. Based on that testimony, the trial court excluded Dr. Loftus's testimony in the instant case as unnecessary and unhelpful to the jury. As the appellant, defendant carries the burden of presenting a sufficiently complete record of the trial court proceedings to support a claim of error, and in the absence of such record on appeal, we presume the trial court's challenged ruling was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts that may arise from the incompleteness of the record are resolved against the appellant. *Id.* As there is no copy of Dr. Loftus's testimony here, we have no basis to assess the accuracy of the trial court's characterization of his testimony.

¶ 42    Furthermore, the trial court's ruling occurred in 2014, before the 2016 *Lerma* decision discussing the dramatic shift in the legal landscape concerning the use of identification expert testimony. Moreover, this case, unlike *Lerma*, involved a situation where the identification testimony would be subject to cross-examination and supported by circumstantial evidence and DNA evidence of defendant's guilt. Under the circumstances of this case, the trial court's decision excluding the expert testimony was not arbitrary or unreasonable and does not amount to an abuse of discretion.

¶ 43    Even if this were the type of case for which expert eyewitness testimony was relevant and appropriate, the trial court's denial of defendant's request was harmless error. To determine whether error is harmless beyond a reasonable doubt, we must consider (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in this case overwhelmingly supported the defendant's conviction, and (3) whether the excluded evidence would have been duplicative or cumulative. *People v. Blue*, 205 Ill. 2d 1, 26 (2001).

¶ 44    Dr. Loftus's testimony would not have been cumulative or duplicative. Nevertheless, the exclusion of his testimony cannot be said to have contributed to defendant's conviction. As discussed above, the other evidence—*i.e.*, the circumstantial evidence and the strong DNA evidence placing defendant inside the stolen vehicle, which was locked when it was recovered and bore noticeable blood-like stains both outside and inside the vehicle—overwhelmingly supports his conviction.

¶ 45                                          C. Jury Instructions

¶ 46    Finally, defendant argues he was denied a fair trial because the trial court refused one of his proposed modified jury instructions regarding weighing the identification testimony of a witness based on the level of certainty the witness showed when confronting the defendant.

¶ 47    According to the record, defense counsel argued to the trial court that the pattern jury instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.15)) was outdated and erroneous because, contrary to the scientific evidence and evolution in the law concerning the reliability of eyewitness testimony, IPI Criminal 4th No. 3.15 still instructed the jury to consider the level of certainty shown by the witness when confronting the defendant. On this issue, the defense proposed two instructions. First, the defense's non-IPI No. 3 instruction stated:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following: The witness's degree of attention at the time of the offense, including the following non-exhaustive list of factors: Stress. Weapon focus. Duration. Distance and lighting. Witness characteristics. Memory decay. Race bias. The opportunity the witness had to view the offender at the time of the offense. The witness's earlier description of the offender. The level of certainty shown by the witness when confronting the defendant. The length of time between the offense and the identification confrontation."

The defense also proposed the following non-IPI No. 4 instruction:

> "Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when

analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification."

¶ 48 Over the State's objection, the trial court allowed the giving of the non-IPI No. 3 instruction instead of IPI Criminal 4th No. 3.15; however, the court deleted from the instruction the terms "witness characteristics" and "race bias" because the definitions of those terms would not be clear to the jury. Further, the court denied the giving of the non-IPI No. 4 instruction, finding that while the language was clear, it sounded more like a defense argument than an instruction to the jury.

¶ 49 On appeal, defendant argues his proposed non-IPI No. 4 instruction was brief, impartial, free from argument, and a more accurate statement of the law on eyewitness identification. It explained that the jury must critically analyze an eyewitness identification, that the identifications were not always accurate, and that a witness's level of confidence was not an indication of an identification's reliability.

¶ 50 The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence presented in the case before them. *People v. Carini*, 151 Ill. App. 3d 264, 282-83 (1986). Whenever applicable, an IPI should be used whenever it accurately states the law. *People v. Pollock*, 202 Ill. 2d 189, 211-12 (2002). A non-IPI instruction should be used only if the IPIs for criminal cases do not contain an accurate instruction and if the tendered non-IPI instruction is accurate, simple, brief, impartial, and free from argument. *Id.* Additionally, the instructions as a whole must not be misleading or confusing. *Id.* We review a trial court's decision to instruct a jury using a non-IPI under the abuse of discretion standard. *Id.* at 211. An abuse of discretion in the refusal of a non-IPI occurs only where there is no IPI applicable to the subject on which the jury should have been instructed and the jury was, therefore, left to deliberate without proper instructions. *People v. Garcia*, 165 Ill. 2d 409, 432-34 (1995).

¶ 51 We find no abuse of discretion when the trial court denied defendant's request to give the jury the non-IPI No. 4 instruction. The court had granted defendant's request, over the State's objection, to give the jury the non-IPI No. 3 instruction that included the witness's certainty factor, which defendant finds problematic on appeal, among the factors the jury should consider when weighing identification testimony. The jury was properly instructed on the issue of identification through the instructions as a whole, and we agree with the trial court's characterization that defendant's non-IPI No. 4 instruction reads more like a defense argument than a jury instruction.

¶ 52                                   III. CONCLUSION
¶ 53 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 54 Affirmed.

¶ 55 PRESIDING JUSTICE GORDON, specially concurring.
¶ 56 I concur in the result, but I must write separately.
¶ 57 The majority concluded, first, that the trial court did not abuse its discretion when it excluded the testimony of Dr. Gregory Loftus, who is an expert on eyewitness identification testimony (*supra* ¶ 42), and, second, that, even if there was error, it was harmless in light of the

fact that defendant's DNA was found inside the victim's locked vehicle (*supra* ¶¶ 43-44). I must write separately because, while I agree with the second conclusion, I do not agree with the first. For the reasons explained below, I would find that the trial court abused its discretion by excluding Dr. Loftus's testimony but that the error was harmless in light of the DNA evidence.

¶ 58 At trial, the victim described the attack, which occurred in the middle of the night between October 3 and 4, 2010. *Supra* ¶¶ 5-8. During a portion of the attack, the attacker obscured his face by pulling a black nylon hair covering down over his face. *Supra* ¶ 9. At trial, the victim denied having provided a description of his attacker to the police immediately after the attack; but he admitted that, several days later, on October 9, 2010, he described his attacker as a "light-skinned black." *Supra* ¶¶ 9, 11. There is no dispute that defendant is not black, but white and Hispanic. *Supra* ¶ 5 ("a 38-year-old white Hispanic male"). On January 22, 2012, which was more than 15 months after the robbery, a police officer, who knew defendant was a suspect, handed the victim a stack of six photos with defendant's photo on top. From this stack, the victim selected two photos, one of which was defendant's photo; but the victim did not make a positive identification at that time. See *supra* ¶ 13. However, after being shown these photos of only Hispanic men, the victim altered his description of the attacker, stating that, although he thought his attacker was a light-complexioned black man, he could have been Hispanic. *Supra* ¶ 13. On March 30, 2012, almost a year and a half after the attack, the victim viewed a lineup in which defendant was the only person present from the prior photo array, and this time the victim positively identified defendant as his attacker. See *supra* ¶ 14. Like the photo array, the lineup was also conducted by a police officer who knew defendant was the suspect.

¶ 59 To say that there were problems with the victim's identification would be an understatement. First, there are the problems in the identification process that the majority observed: (1) the victim's only opportunity to view his attacker was at night; (2) it was of short duration; (3) it involved a weapon, and thus, the victim's focus was most likely on the weapon; (4) the event was stressful and sudden; (5) the victim's knife wounds and blood loss were severe; (6) the attacker's face was covered for a part of the short duration; (7) the victim did not know his attacker and had never seen him previously; (8) the positive identification occurred over a year after the attack; and (9) the victim had been exposed to some postevent information. *Supra* ¶ 36.

¶ 60 In addition, this was not only a cross-racial identification, which is normally fraught with problems, but in this particular case, the victim actually expressed difficulty in distinguishing a black man from a Hispanic man.

¶ 61 However, the most problematic parts of the identification were (1) that the victim did not state that his offender could have been Hispanic until after the police showed him a photo array of nothing but Hispanic men, thereby inadvertently communicating their belief that the attacker was, in fact, Hispanic (despite the victim's clear and unequivocal prior statement that his attacker was black), and (2) that defendant was the only person whom the police placed in both the photo array and the subsequent lineup, thereby inadvertently communicating to the victim that it was defendant whom the police suspected.

¶ 62 One of two things should have happened here: either the trial court should have granted defendant's motion to suppress the victim's identification, or it should have granted his motion to present expert testimony on the subject of eyewitness identification. However, letting this

tainted and problematic identification process go to the jury, without the aid of expert testimony, was an abuse of discretion.

¶ 63    In *People v. Lerma*, 2016 IL 118496, ¶¶ 1, 14, our supreme court held that a trial court abused its discretion by excluding the expert testimony of Dr. Loftus, who is the very same expert that defendant sought to call in this case and who the supreme court described as a "widely published and globally recognized expert in the field of human perception and memory." Our supreme court explained that, "although findings of the sort described in *** Dr. Loftus's reports are now 'widely accepted by scientists,' those same findings 'are largely unfamiliar to the average person, and, in fact, many of the findings are counterintuitive.' " *Lerma*, 2016 IL 118496, ¶ 24 (quoting *State v. Guilbert*, 49 A.3d 705, 723-24 (Conn. 2012)). The supreme court observed that, "of the several factors" that Dr. Loftus "identified as potentially contributing to the unreliability of eyewitness testimony, most are either present or possibly present in this case. These include [(1)] the stress of the event itself, [(2)] the use and presence of a weapon, [(3)] the wearing of a partial disguise, [(4)] exposure to postevent information, [(5)] nighttime viewing, and [(6)] cross-racial identification." *Lerma*, 2016 IL 118496, ¶ 26. As we explained above, every single one of these factors is also present in our case.

¶ 64    The *Lerma* court found that the trial court's abuse of discretion violated due process, since a criminal defendant's right to due process includes the right to present witnesses on his or her own behalf. *Lerma*, 2016 IL 118496, ¶¶ 1, 23. The case before us is complicated by further due process concerns, which were not present in *Lerma*, such as the concern that the police may have, inadvertently or deliberately, swayed the victim's identification by showing him only Hispanic men as suspects although he had said that the suspect was a black man and by showing him a lineup where defendant was the only person who had been present in the prior photo array—and certainly the only person who had been on the top of the stack.

¶ 65    Although the trial court abused its discretion in excluding the expert's testimony, there is still no way around the fact that defendant's DNA was found both inside the victim's locked vehicle and mixed with blood on the exterior driver's-side door handle. The majority assumes that the blood on the door handle belonged to the victim and refers to it as the victim's blood (s*upra* ¶ 38). However, at trial, the testimony was that the victim was merely "assumed to be the source of one of the profiles based on the case information." *Supra* ¶ 15. Nonetheless, it is hard to imagine a rational explanation for how the DNA of a complete stranger, like defendant, wound up inside the victim's locked vehicle. Thus, while it was an abuse of discretion for the trial court to exclude defendant's expert testimony, in the end I must conclude that this error did not change the result at trial.

¶ 66    For these reasons, I concur in the majority's ruling to affirm defendant's conviction but not in the majority's analysis in its opinion.