2021 IL App (1st) 181464-U

FIRST DISTRICT,
FIRST DIVISION
September 27, 2021

No. 1-18-1464

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 21043 (02) |
| | ) | |
| MARQUIS CEAZER, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pierce concurred in the judgment.
Justice Walker dissented.

**ORDER**

¶ 1     *Held*:   The trial court properly exercised its discretion in limiting the scope of expert witness testimony and barring questions about the composition of the photo array on cross-examination of the State's witness.

¶ 2     Following a jury trial, defendant Marquis Ceazer was convicted of first degree murder and sentenced to 43 years' imprisonment. On appeal, defendant argues that the trial court abused its discretion when it limited the scope of his expert witness's testimony on the topic of eyewitness identification and reliability and barred questions on cross-examination of the State's witness regarding the composition of the photo array. We affirm.

¶ 3                                          BACKGROUND

¶ 4          Defendant's first degree murder conviction resulted from the shooting death of Philip Henderson and the evidence against him rested exclusively on the identification of two eyewitnesses–Christine Barnes and Ezra Coleman. Neither eyewitness knew defendant. The trial court denied defendant's pretrial motion to suppress identification testimony based on suggestive identification procedures.

¶ 5          Barnes testified that on September 30, 2013, between 9:30 and 10 a.m., she was in a parked car at 62nd and Champlain with her boss, Coleman, waiting for equipment for their job. As she looked out the windshield from the front passenger seat, she saw two men walk in front of the car. They were "about a couple feet [away], they could have touched the car." She noticed the men because "they were the only ones out there" and the "taller gentleman *** actually caught [her] attention because he kind of [looked like] a friend of [her] son's," but he was not the friend. Barnes made an in-court identification of defendant as one of the two men, indicating that he was not the "taller gentleman."[1]

¶ 6          When the two men got to the other side of the street, they met up with the victim, later identified as Henderson. Barnes observed what "looked a transaction," where Henderson reached into his pocket and "came out with money." Defendant and Henderson "got to fighting" and defendant "actually pulled a gun on him." Barnes noticed earlier when defendant first crossed the street that he "had his right hand up under his sweater, but [she] didn't know at the time that he had anything on him." When defendant "saw the money, that's when he took it out." Defendant and Henderson "fell fighting" and "the gun dropped to the ground." "Within a split second of [the gun] falling, *** the other gentleman that was walking with [defendant] picked it up" and "fired a

_____

[1] Barnes testified that she remembered defendant on the day of the shooting as looking "scary, he looked real scary, he had a hoodie on, he had dreads in his hair, he had a mean look on his face, real thick eyebrows *** I remember saying if I was coming down the street, I would cross the street."

shot in the air above his head." Defendant "push[ed] [him]self away from the victim." The "tall man" "pointed [the gun] at the victim that was on the ground and he let off like two or three shots."[2]

¶ 7 While that was occurring, Barnes tried "to let [her] seat back" because she "didn't want to get a bullet." She "told [Coleman] what was going on and to start the car to get away." At that point, Coleman drove the car straight down Champlain and she continued watching the victim, defendant, and the "tall guy," who were on her side of the car. Coleman pulled around the corner and they called the police. They returned to the scene and she "noticed [the person that had just been shot by the tall guy] laying on the ground." After the police arrived, she and Coleman drove to the police station together "in shock" and talked about what had just happened.

¶ 8 At the police station, a detective separately interviewed her and Coleman. She described defendant, within a couple hours of seeing him, as a black male, heavier than the other offender but not too big, thick eyebrows, dark skin, thick shoulder length hair, dreads with long bangs, black jeans with white threads in the pants, wearing a blue hoodie, and about 5'7.

¶ 9 The next day (October 1), a detective met her and Coleman at Coleman's house to show them a photo array. She was already with Coleman that day because they worked together.[3] When she viewed the photos, Coleman "wasn't around, he was out of the house." The photo array was comprised of six men, four wore white or off-white shirts, one wore a colorful shirt, and defendant wore a black shirt. Barnes viewed all six photos simultaneously and identified defendant. When asked whether she identified defendant "because he was wearing a black shirt or because she recognized him as the person who pulled the gun out, struggled with the victim right before he was shot and killed," she responded, "I recognized him *** I'll never forget his face."

_____

[2] Kiarunn Bailey was the other offender and he pled guilty before defendant's trial started.
[3] Coleman and Barnes stopped working together about a week after the murder and had no further contact with each other.

¶ 10 On October 3, 2013, she went to the police station with Coleman to view the live lineup. Coleman was not with her when she viewed the lineup, and she did not talk to him at all right before or after viewing the lineup. She identified defendant, who was the only individual appearing in both the photo array and lineup.

¶ 11 Coleman testified consistently with Barnes. He stated that the two men walked a "few feet away [from the car] because [he] was right on the corner." He made an in-court identification of defendant, "who was walking closer to him." After the two men walked past, he "was looking around, listening to music or something" until Barnes told him that "they were tussling." He saw defendant tussling with Henderson and then saw the other guy "wave a gun in the air and fire a shot." As he drove away, he "heard some more gunshots." After calling 911, they returned to the scene within a minute to a minute and half to see if they could "help the guy." He and Barnes did not talk about what happened because they "were in shock" and she "was crying." He later drove to the police station where he was interviewed and described the offenders to the detective as "one *** heavier than the other, one was shorter, and one had longer dreads and one had short dreads."

¶ 12 On the next day (October 1), he and Barnes viewed a photo array at his house, and he recognized defendant as the guy tussling with the victim. Barnes was somewhere else in the house when he identified defendant. On October 3, 2013, he and Barnes drove to the police station together to view a lineup, but they viewed the lineups separately and were not allowed to talk to each other. He identified defendant because he "recognized his face" and not because he was the only person who appeared in both the lineup and photo array or because he was the only person wearing a black shirt.

¶ 13 Detective Daniel McNally testified that on the day after the shooting (October 1), he met with Coleman and Barnes to show them a photo array. He explained that a "photo array is a compilation of multiple photographs including a suspect and additional photographs of what we

call fillers, who are just more or less extras in the photo array, that have a similar likeness." He testified that defendant was "the potential suspect" in the photo array but was not allowed to testify that there were other possible suspects in that photo array. Both Coleman and Barnes identified defendant as the offender.

¶ 14    Detective Daniel Stanek testified that on October 3, 2013, he conducted the physical lineup. Both individuals identified defendant. He did not give any feedback to Coleman or Barnes after they identified defendant in the lineup.

¶ 15    The court then addressed the State's motion *in limine* seeking to limit the testimony of Dr. Geoffrey Loftus, the defendant's expert witness. The State agreed with the defense that Dr. Loftus was an expert in human memory and perception. The court denied defense counsel's request to tell the jury that Loftus was an "expert" reasoning "that's like telling the jurors, you heard all the evidence you're going to hear up to now; now you'll hear what really happened. He'll testify what he'll testify about." The court explained that "I think it adds to his credibility by me saying, ladies and gentlemen of the jury, Dr. Loftus is an expert in the field of such-and-such. They'll decide the issue, they'll decide his credibility. Not me."

¶ 16    After hearing argument and discussing the report written by Dr. Loftus paragraph by paragraph, the trial court allowed him to testify but barred testimony at trial about (1) exoneration projects or studies as irrelevant; (2) the principle that an eyewitness's level of certainty does not always correlate to the accuracy of an identification, finding that testimony to be "common sense" and confusing with the pattern jury instruction addressing the reliability of identification testimony (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (Dec. 8, 2011)); (3) any bias in the composition of the photo array, which was for the jury to decide; (4) the reasons why experts recommend double-blind identification procedures; (5) the lineup-feedback effect because there

was no evidence that detectives provided identification feedback to the witnesses; and (6) the reliability of an identification made by two eyewitnesses.

¶ 17        Dr. Loftus, Emeritus Professor at the University of Washington, testified that he had a Ph.D. in the field of experimental psychology, which "is broadly divided in clinical psychology on the one hand and experimental psychology on the other." He has studied human memory and perception for "[a]bout 50 years all told."

¶ 18        Dr. Loftus explained that memory begins with "an event" and any witness to this event has "some form of memory that's *** made up of information." A memory is formed through two routes: the "conscious experience" and from "post-event information." Under the "conscious experience" route, "the brain constructs an image, a representation, a conscious experience of what it is that's going on" based on "sensory data" and using that "conscious experience *** some information about the event [gets] into memory."

¶ 19        Through the "post-event information" route, an individual acquires "information that is relevant to an event that is available to the witness at varying times after the event itself is over." Under certain circumstances, a witness may "acquire post-event information *** for the event as a means of supplementing the memory they have filling the gaps, plugging the holes, making for a more coherent story of what happened." Dr. Loftus stated that the "bottom-line conclusion *** is that under the right circumstances, a witness can wind up with a memory that is very filled with information, very complete, very detailed, very real seeming, but a memory that unbeknownst to the witness is potentially false in maybe important ways because unbeknownst to the witness, it is largely based on post-event information that is of dubious accuracy."

¶ 20        Dr. Loftus testified that attention as it relates memories can be impacted by various factors, such as stress, presence of a weapon, and the "functional duration" of the event. He explained that in situations of "extremely high stress, people are less capable of any sort of mental functioning,

including memorizing the appearance of people around them compared to being under conditions of moderate stress." Under the principle of "weapons focus," Dr. Loftus explained that "if there's a weapon on the scene, people will be less likely to perceive and remember the appearance of the person who's holding the weapon compared to if the person is holding some benign object like a checkbook or a comb." As to the concept of "functional duration," he explained that "for a witness to be in a position to perceive and memorize an offender's appearance, several things have to be simultaneously true. The offender has to be in the witness's field of view and not blocked by a car, a street post, or whatever. The offender has to be close enough to the witness so the witness can make out the fine details of their face. ***[T]he witness has to be specifically paying attention to the offender's appearance. It's only when all of these things, and other things as well, are simultaneously true that the witness can use the duration to perceive and memorize what the offender looks like."

¶ 21        Dr. Loftus also discussed the reliability of a "positive identification." He explained that a "positive identification is only reliable if from the identification you can conclude that there is a strong match between the witness's memory of the offender on the one hand and the appearance of the suspect on the other. If you can make a conclusion that there's a strong match, then the identification is reliable. If you can't make the conclusion from the positive identification that there's a strong match, the identification is not reliable."

¶ 22        Regarding the reliability of photo arrays, he explained that the reason for compiling a photo array with a single suspect and five fillers is to reduce the chance of a false identification. He also explained that photo arrays may be shown "simultaneously," where "all members of the photo array are shown on a single piece of paper" or "sequentially," where photographs are shown "one by one to the witness, such that the witness only sees one member of the photo spread at a time." He stated that "it's been shown that presenting the photo spreads sequentially *** substantially

reduces the chances of a false identification." The same principle applies to a live lineup. Regarding a live lineup, he elaborated that if "the photo spread has a suspect and one batch of fillers and the live lineup has the same suspect, but a different batch of fillers that would be not a recommended way of carrying out an identification procedure." He explained that "if the witness positively identifies the suspect in the live lineup you don't know whether it's because the suspect in the live lineup matches the witness's memory of the actual offender seen at the time of the crime or whether the witness is matching the appearance of the suspect in the live lineup to his or her memory of the same suspect seen previously in the photo spread."

¶ 23        Finally, Dr. Loftus described the concept of a "double-blind procedure," which refers to a lineup in which the police officer conducting either the live lineup or the photo spread does not know who the suspect is." Regarding the "double-blind procedure," he stated that "the preferred practice is to present a photo array or a live lineup double-blind as opposed to presenting it by a police officer who knows who the suspect is."

¶ 24        On cross-examination, Dr. Loftus stated that he never spoke to Barnes or Coleman because he "had no reason." He explained that he does not interview any witnesses because "[i]t's not relevant to the goal I have when I'm testifying to provide scientific information to the jury that allows them to more easily, I hope, do their job of evaluating the witnesses' testimony and deciding the degree to which it's credible or reliable." Dr. Loftus did not opine on whether the eyewitnesses in this case made accurate identifications.

¶ 25        The jury found defendant guilty of first degree murder and he was sentenced to a term of 43 years' imprisonment.

¶ 26                                    ANALYSIS

¶ 27        Defendant argues that he "was denied his right to a fair trial when the trial court greatly restricted an eyewitness expert's testimony in a case where the evidence boiled down to the brief

observations of two people." He claims that the trial court abused its discretion by refusing to expressly qualify Dr. Loftus as an "expert" to the jury and barring him from testifying about the studies and research supporting his opinions.

¶ 28 A criminal defendant has the right to present witnesses in his own defense. *People v. Lerma*, 2016 IL 118496, ¶ 23. Expert testimony is only necessary where the subject of the testimony is particularly within the witness's experience and qualifications and beyond that of the average juror. *Id.* A trial court's decision to exclude or admit expert testimony is reviewed under an abuse of discretion standard. *Id.* A trial court abuses its discretion when its decision is " 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Id.* (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37). In exercising its discretion, "the trial court should carefully consider the necessity and relevance of the expert testimony in light of the particular facts of the case before admitting that testimony for the jury's consideration." *Id.* ¶ 23.

¶ 29 Here, the jury had sufficient information to assess the weight and credibility of Dr. Loftus's testimony regardless of whether he was formally identified as an "expert" by the court.[4] For example, defense counsel in opening statements informed the jury that "because eyewitness identification is complicated, you're going to hear from an expert, Dr. Loftus, who will testify about his expertise of eyewitness identification, memory, and how police lineup procedures impact that." The jury also learned about Dr. Loftus's qualifications and credentials when he described his professional background, which included working in human perception and memory for about

---

[4] Although the usual custom and practice ordinarily involves the trial judge qualifying a witness as an expert in the presence of a jury, we find no error with the trial judge's practice in this case under Illinois Rules of Evidence 702 (eff. Jan. 1, 2011). See *In re Commitment of Jake Simmons*, 2012 IL App (1st) 112375-U (unpublished order under Supreme Court Rule 23) ("We express no view as to whether the better practice is to avoid such qualifications of witnesses as experts in the presence of the jury. However, we cannot find that the trial court's decision to do so in this case at bar was error."). Moreover, here, the State's witness was qualified as an expert and presented to the jury in the same manner as the defense's expert witness.

50 years, authoring or coauthoring eight books and "somewhere around 110 journal articles and some book chapters," and presenting "maybe 150 or so *** lectures to various universities and other organizations both describing the research that [he has] done and describing applications of the research that [he has] done." Moreover, the jury's "ability to assess expertise" was not frustrated by "barring all references to the studies and research that supported Dr. Loftus's opinions," particularly because the excluded material overall cited general studies, provided the source of definitions, and referenced experiments or exoneration studies that likely would not have furthered any credibility assessment given his extensive background in human memory and perception relayed to the jury. This record simply does not support defendant's claim that "the court's rulings effectively neutered the expertise of the sole defense witness."

¶ 30 Defendant also argues that the trial court improperly "restricted the substance of Dr. Loftus's testimony." Defendant relies heavily on *People v. Lerma*, 2016 IL 118496, where our supreme court "reiterate[d] *** that eyewitness identification is an appropriate subject for expert testimony." *Id.* ¶ 28. The *Lerma* court held that the trial court abused its discretion by barring any expert testimony on the reliability of eyewitness identifications in a first degree murder case,[5] finding such testimony to be relevant and probative where "the State's case against defendant hangs 100% on the reliability of its eyewitness identifications." *Id.* ¶ 26.

¶ 31 In this case, unlike the facts of *Lerma*, the trial court did not prohibit the defense from introducing Dr. Loftus's testimony regarding the reliability of eyewitness identifications. Although he was precluded from testifying about certain studies and research and matters the court considered to be within common knowledge, potentially confusing to the jury, and factors that did not fit the facts of this case, he testified extensively about memory and perception and factors that

_____

[5] Dr. Loftus was also the defense witness in *Lerma*. 2016 IL 118496, ¶ 25.

affect the reliability of eyewitness identification, such as the impact of post-event information. See *id.* ¶ 23 (expert testimony addressing matters of common knowledge is only admissible if the subject is difficult to understand and explain). Dr. Loftus also testified about the composition and reliability of photo array and lineup procedures, matters vital to the State's case and the defense as the only evidence against defendant was eyewitness identifications. Unlike in *Lerma*, the trial court here conducted a meaningful inquiry into Dr. Loftus's proposed testimony and its rulings regarding the scope of his testimony adhered to the principles of *Lerma*. Therefore, the trial court did not abuse its discretion in limiting the scope of Dr. Loftus's testimony on matters that would not have assisted the jury in reaching its conclusion. See *People v. Enis,* 139 Ill. 2d 264, 288 (1990) (expert testimony is admissible "where such testimony will aid the trier of fact in reaching its conclusion"); *People v. Corral*, 2019 IL App (1st) 171501, ¶ 114 (excluding a portion of the expert's testimony regarding the reliability of an eyewitness's identification was not an abuse of discretion); *People v. Strowder*, 2018 IL App (1st) 160920-U (unpublished order under Supreme Court Rule 23) (*quoting People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 30) (the court in *Lerma* "did not abolish the requirement that a trial court 'carefully consider the necessity and relevance of the expert testimony in light of the facts before [it].' ").

¶ 32    Next, defendant argues that he "was unable to properly defend himself as he was not permitted to correct inaccurate testimony from a detective indicating [he] was the only suspect in the initial photo array."

¶ 33    A defendant has the constitutional right to cross-examine witnesses and present a defense. *People v. Blue*, 205 Ill. 2d 1, 12 (2001); *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 67**.** However, the trial court is vested with "the power and discretion to exclude evidence offered by the defense in a criminal case on the basis of irrelevancy without infringing on an accused's constitutional right to present a defense." *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 51. We

will not reverse the court's decision to limit cross-examination absent "a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Kirchner*, 194 Ill. 2d 502, 536 (2000).

¶ 34    Here, the trial court properly exercised its discretion given its prior ruling barring testimony about other possible suspects in the photo array based on relevancy and hearsay grounds.[6] Defendant acknowledges that "before trial, the defense sought to include testimony about the multiple suspects in the array to show the course of the police investigation and so that Dr. Loftus could testify about the array's possible bias." The trial court denied that request. Nevertheless, defendant now argues that he was entitled to elicit such testimony because "the State opened the door for clarification when it implied the initial array was composed in the typical way and included only one suspect." But the record does not establish that the detective's testimony that defendant was "the potential suspect" in the photo array was prejudicial as misleading. See *contra People v. Weaver*, 92 Ill. 2d 545, 556 (1982) (error for the jury to hear only a portion of a witness's statement because a "person whose spouse has just been murdered by two armed intruders is likely to say more about the matter than [the witness's] testimony indicated"). We find that the trial judge did not abuse his discretion in barring questions on cross-examination about the composition of the photo array.

¶ 35    Even assuming *arguendo* that the trial court's rulings limiting Dr. Loftus's testimony and barring cross-examination about the composition of the photo array were erroneous, any potential error would have been harmless. "Under a harmless-error analysis, the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict." *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57.

---

[6] Defendant does not explicitly appeal the trial court's ruling denying his motion *in limine* to suppress identification testimony.

¶ 36      Here, any potential error resulting from excluding a portion of Dr. Loftus's otherwise comprehensive testimony would not have contributed to defendant's conviction. *People v. King*, 2020 IL 123926, ¶ 40. First, Barnes gave officers a detailed description of defendant within hours of witnessing the murder. In addition, the two eyewitness identifications of defendant were unequivocal and credible. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("the testimony of a single witness, if positive ad credible, is sufficient to convict, even though it is contradicted by the defendant"). Moreover, the jury heard relevant and probative testimony from defense witness Dr. Loftus addressing memory and perception, including factors affecting the reliability of eyewitness identifications. Based on this evidence, "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005); see *People v. Jackson*, 2020 IL 124112, ¶ 127 ("To establish that any error was harmless, the State must prove beyond a reasonable doubt that the result would have been the same absent the error."). For those reasons, any potential error would have been harmless.

¶ 37                                 CONCLUSION

¶ 38      For the reasons stated, we affirm defendant's first degree murder conviction.

¶ 39      Affirmed.

¶ 40      JUSTICE WALKER, dissenting:

¶ 41      I respectfully dissent because the trial judge abused his discretion by barring Dr. Loftus's highly probative testimony concerning the reliability of the eyewitness identification of Ceazer as one of the offenders.

¶ 42      First, the judge barred any reference to the extensive research that supported Dr. Loftus's conclusions concerning the reliability of eyewitness identifications. Our supreme court established the relevant principles in *People v. Anderson,* 113 Ill. 2d 1, 12 (1986) (internal quotation marks omitted):

"To prevent the expert from referring to the contents of materials upon which he relied in arriving at his conclusion places an unreal stricture on him and compels him to be not only less than frank with the jury but also * * * to appear to base his [conclusions] upon reasons which are flimsy and inconclusive when in fact they may not be. [Citation.] Absent a full explanation of the expert's reasons, including underlying facts and opinions, the jury has no way of evaluating the expert testimony (citation) and is therefore faced with a meaningless conclusion by the witness."

¶ 43     Dr. Loftus's written report contains the testimony the judge barred. Dr. Loftus said: "Rather striking results, that underscore the critical relation between focused attention and later memory, issue from experiments on change blindness (citation). These experiments demonstrate that, even when a witness engages in direct, face-to-face conversation with some person, the witness often will not recognize the person even seconds later—thereby demonstrating the requirement that a witness pay specific attention to a person's appearance in order to be later capable of identifying that person. This is relevant to Mr. Coleman's and Ms. Barnes's initial encounter with the shooters, at which time they would have had no reason to pay attention to what they looked like.

*** A special note is warranted about attention to the gun that was used by the shooters. Research has been carried out on this topic which has been dubbed weapon focus. Weapon focus refers to inclination of people to pay attention to a weapon when a weapon is present, at the expense of attending to other potentially relevant aspects of the scene, such as the appearance of the person who is wielding the weapon or, for that matter, the appearance of anyone in the vicinity. Numerous

experiments have demonstrated this to be true [Citations.] Finally, it is to be noted that in the unlikely event that either Mr. Coleman or Mr. Bailey did chance to focus their attention on the shooters' appearance, they would have had to divide their already limited attention between the two shooters. This means (roughly speaking) that either shooter's appearance would have been allocated, on average, only half the attention that would have been available had there been only a single shooter present."

¶ 44    The judge barred any reference to the reasons to prefer double-blind procedures for identification and the lineup feedback effect.  Dr. Loftus explained in the barred testimony that when the officer conducting the lineup knows which person in the lineup the arresting officers hope to identify as the offender, the officer may unconsciously give the witness cues about which person to identify. Also, following the identification, the officer may "alert the witness—again either deliberately or unconsciously —that he [she] made the right choice," (internal quotation marks omitted), thereby increasing the witness's confidence in the identification.

¶ 45    The judge disallowed the opinions altogether, even though police did not use double-blind procedures here.  The judge said, "I think it's pure speculation for Dr. Loftus, *** to say, well, it happens sometimes; and since the cop knows who the suspect was, he somehow conveyed that to the witness. That's pure speculation at its highest."

¶ 46    The judge also excluded evidence of studies showing that double-blind procedures lead to fewer misidentifications.  Dr. Loftus would have testified: "Experimentally it has been shown that these kinds of increased confidence take place whether or not the witness made the correct identification to begin with. The consequences of the lineup-feedback effect when a witness has

falsely identified an innocent suspect is that the witness will display increased confidence when eventually identifying the defendant at trial."

¶ 47    The decision to bar the highly relevant, probative evidence concerning double-blind procedures and the lineup feedback effect ties directly to the judge's most egregious error. Dr. Loftus, in his proffer, said:

> "[C]ontrary to common sense, a confident witness may not be an accurate witness. Over the past three decades, this issue has been attracting the attention of the judicial community, largely because of the increasing number of cases in which convicted but eventually exonerated individuals are found to have been originally convicted on the basis of confident, yet false identifications of the defendant at trial. *** Studies have established that the confidence level that witnesses demonstrate regarding their identifications is the primary determinant of whether jurors accept identifications as accurate and reliable.
>
> ****
>
> *** Post-event information has been the subject of a substantial body of research over the past 40 years. [Citations.] To the degree that post-event information is false, adding it to memory causes the memory to become stronger and more confidence-inducing, but at the same time less accurate. Addition of such post-event information is typically an unconscious act: that is, a witness is typically unable to distinguish which aspects of an eventual memory are based on original events, versus which are based on post-event information added subsequent to the event. *** Above I described the accumulating cases in which convicted defendants in criminal trials were later exonerated, typically, on the basis of DNA comparisons. It is noteworthy in judging the consequences of multiple-witness

identification, that in about a third of the exoneration cases that involved false eyewitness identifications of the defendant, multiple witnesses falsely identified the defendant. Thus, multiple eyewitness identifications by no means guarantees that the common identifications are accurate. ***

Mr. Coleman and Ms. Barnes' likely confident in-court identifications of Mr. Ceazer as one of the shooters will therefore be based on strong memories of Mr. Ceazer as the shooter. However, and critically, these strong memories of Mr. Ceazer as the shooter will not, as Mr. Coleman and Ms. Barnes will likely believe, have been constructed based on their perceptions of the actual shooter operating during the actual shooting, but rather will have been reconstructed after the fact, based on the kinds of post-event information, just described.

***. Generally speaking, and contrary to common sense, confidence cannot be used as an index of accuracy when (a) circumstances for forming and maintaining the original memory are poor, and (b) there are apparent sources of potentially false and biasing post-event information [Citations.]  As indicated above, both of these circumstances apply in this case."

¶ 48     Our supreme court's holding in *People v. Lerma,* 2016 IL 118496, ¶ 32, applies directly here:

"[W]hat we have in this case is the trial court denying defendant's request to present relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence against him and, doing so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case. A decision of that nature rises to the level of both arbitrary and unreasonable to an unacceptable degree, and we therefore find that the trial court's decision denying

defendant's request to admit Dr. Loftus's expert testimony was an abuse of discretion."

¶ 49    Here, the majority's paragraph on harmless error confusingly concludes that error made no difference because the State presented evidence "sufficient to convict defendant of first-degree murder," while citing a case that says, "the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." Supra at ¶ 32. Our supreme court has held that an evidentiary error does not require reversal if "there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." *In re E.H.,* 224 Ill. 2d 172, 180 (2006) (emphasis in original) (internal quotation marks omitted.) The *Lerma* court applied a different standard, finding the evidentiary error not harmless because the State did not prove beyond a reasonable doubt that the jury would have reached the same verdict if the court had not erroneously barred Dr. Loftus's testimony. Under either standard, the error was not harmless.

¶ 50    Dr. Loftus's opinions concerning the reliability of eyewitness identifications may well have persuaded an impartial trier of fact to doubt the identifications here. I find a reasonable probability that an impartial trier of fact would conclude that the State had not proven beyond a reasonable doubt that Ceazer committed murder. The holding of *Lerma,* 2016 IL 118476, ¶ 33, applies directly: "the trial court's decision excluding Dr. Loftus's testimony was not harmless beyond a reasonable doubt. First, there is no question that the error contributed to the defendant's conviction, as the exclusion of Dr. Loftus's testimony prevented the jury from hearing relevant and probative expert testimony relating to the State's sole testifying eyewitness[es], in a case lacking any physical evidence linking defendant to the crime. *** [T]he excluded testimony from Dr. Loftus was neither duplicative nor cumulative of other evidence."

¶ 51    I express no opinion on the other errors Ceazer has alleged because prejudicial error in the limitation of Dr. Loftus's testimony requires reversal. Accordingly, I respectfully dissent.