2026 IL App (1st) 232494

No. 1-23-2494

Opinion filed May 8, 2026

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.16 CR 13463 |
| ALEEM MINNIS, | ) ) | |
| Defendant-Appellant. | ) ) ) | The Honorable Angela Munari Petrone, Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion. Presiding Justice Mitchell and Justice Wilson concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Aleem Minnis was convicted after a jury trial of 2 counts of aggravated kidnapping and 12 counts of aggravated criminal sexual assault. The counts stemmed from an attack in the early morning hours on June 26, 2016, when defendant forced his way into the victims' car at gunpoint and sexually assaulted each of the two female victims multiple times. Defendant was sentenced to a total of 96 years with the Illinois Department of Corrections (IDOC).

¶ 2        On appeal, defendant claims (1) that the trial court abused its discretion when it rejected his request, made shortly before trial, to substitute a counsel who was not ready for trial; (2) that the trial court erred in denying defendant's pretrial motion to suppress the identification testimony of the two victims, where the police failed to instruct the witnesses not to speak with each other between identifications, where the police used the same photo array in both identification procedures, although conducted at different locations, on different days, and before different administrators, and where the witnesses did speak to each other before the second procedure, although not about the photo selected; and (3) that defendant's 96-year sentence was excessive, where defendant was 23 years old with rehabilitative potential and where the trial court allegedly held defendant's assertions of innocence against him. For the following reasons, we do not find these arguments persuasive and affirm.

¶ 3                                    BACKGROUND

¶ 4        On appeal, defendant does not argue that the evidence at trial was insufficient to convict him; therefore, we summarize it below.

¶ 5        The evidence at trial established that the two victims, L.B.E. and B.M., both aged 31 years old, drove to a sub shop at 2 a.m. on June 26, 2016, where they ordered food. While they were in the shop, defendant tried to talk to L.B.E., asked for her number, and tried to give her his number. In response, L.B.E. pretended to put a number in her phone. After retrieving their order, the two women returned to B.M.'s car, with B.M. entering the driver's side and L.B.E. entering the front passenger's side. Defendant approached and stood with a gun drawn, such that L.B.E. could not close her door. Defendant told them he would shoot if they screamed, and he entered the back seat behind L.B.E. While holding the gun, he directed B.M. to drive to a nearby vacant parking lot one block away and park near a dumpster, where he ordered

them to remove their clothes. While holding the gun in one hand, he used the other hand and his mouth to open a condom wrapper, and he put a condom on. Defendant then ordered one woman and then the other in the back seat with him and forced them each to perform multiple sex acts. After defendant eventually ejaculated into the condom, he permitted the victims to put their clothes back on and directed them to exit the car and stand behind the dumpster. L.B.E. could see defendant moving around the car like he was "cleaning up." After defendant left, the victims called 911. The victims were transported to the hospital where sexual assault kits were performed. Both victims identified defendant pretrial from a photo array.

¶ 6        In addition, a swab of the empty condom wrapper revealed a DNA mixture of at least three people that was not suitable for comparison at the time of the offense. However, prior to trial, the State used a newer method called STRmix DNA analysis. A DNA analyst testified that, while this method does not provide a "match," it does provide a likelihood ratio of a person being a contributor. The analyst testified: "The DNA found from the condom wrapper is approximately 110,000 times more likely if it originated from [defendant] and two unknown unrelated individuals than if it originated from three unknown unrelated individuals." He concluded: "This analysis supplied strong support for the proposition that [defendant] is a contributor to the DNA file identified from [the] condom wrapper." No challenge is raised to the DNA evidence on appeal.

¶ 7        After listening to the evidence, closing arguments and instructions, the jury found defendant guilty. The trial court denied defendant's posttrial motion for a new trial and sentenced him to a total of 96 years. After his motion to reconsider sentence was denied, defendant filed a notice of appeal, and this appeal followed.

¶ 8                                    ANALYSIS

¶ 9                                    I. Denial of Substitute Counsel

¶ 10         Defendant argues that the trial court abused its discretion in denying his motion for a continuance to substitute new counsel on the eve of trial. Both parties cite in support *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008). In *Tucker*, this court held: "The right to counsel of choice, while fundamental, may be limited in some cases." *Tucker*, 382 Ill. App. 3d at 920. "It is within the trial court's discretion to determine whether the defendant's right to selection of counsel unduly interferes with the orderly process of judicial administration." *Tucker*, 382 Ill. App. 3d at 920.

¶ 11         "Factors to be considered include: [(1)] whether defendant articulates an acceptable reason for desiring new counsel; [(2)] whether the defendant has continuously been in custody; [(3)] whether he has informed the trial court of his efforts to obtain counsel; [(4)] whether he has cooperated with current counsel; and [(5)] the length of time defendant has been represented by current counsel." *Tucker*, 382 Ill. App. 3d at 920; *People v. Adams*, 2016 IL App (1st) 141135, ¶ 13 (citing the five *Tucker* factors with approval). Further, new counsel must be ready, willing, and able to appear on defendant's behalf. *Tucker*, 382 Ill. App. 3d at 920. In *Tucker*, 382 Ill. App. 3d at 923, we reversed and remanded due to "the trial court's failure to inquire more thoroughly into defendant's request" for a continuance to substitute counsel.

¶ 12         We found that the trial court in *Tucker* failed to ask defendant (1) "why he wanted another lawyer," (2) "what he meant when he said that he [had] 'hired' another attorney," and (3) "whether he could afford" this new counsel. *Tucker*, 382 Ill. App. 3d at 923. In addition, we found that the trial court had made "no finding that defendant's attempt to hire a new lawyer was a delaying tactic and not in good faith." *Tucker*, 382 Ill. App. 3d at 923-24. "Given the

failure of the trial court to inquire" into the circumstances of defendant's request, this court had no choice but to reverse. *Tucker*, 382 Ill. App. 3d at 924; *People v. Bingham*, 364 Ill. App. 3d 642, 645 (2006) (the trial court abused its discretion in denying defendant's motion to substitute counsel, when it failed to conduct "an inquiry into the circumstances and the purposes of the motion before making its ruling").

¶ 13    In the case at bar, defendant does not claim a failure to inquire, nor could he, given the trial court's extensive questioning over several court dates. Thus, the issue before us is whether, based on the extensive record that the trial court developed, the trial court abused its discretion in denying defendant's motion to substitute counsel. Both sides agree that this court reviews only for an abuse of discretion, and they are correct. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000) ("The determination whether to grant a continuance for substitution of counsel *** will not be overturned absent an abuse of that discretion."); *Bingham*, 364 Ill. App. 3d at 645 ("the trial court's denial of a defendant's request for a continuance [to substitute counsel] will not be overturned absent an abuse of discretion"). A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court. *People v. Kilkelly*, 2026 IL App (2d) 240776, ¶ 37. In the case at bar, the trial court noted that defendant's case had been pending for almost eight years and then found that defendant's request was "a stalling technique to thwart the effective administration of justice."

¶ 14    The record establishes that defendant was arraigned on September 15, 2016, and retained his first private counsel who represented him in 2016 and during the first half of 2017. On August 17, 2017, the public defender substituted as counsel, at defendant's request. On August 25, 2020, the private attorney, who ultimately represented defendant at trial, sought

leave to file his appearance and to replace the public defender. At that time, the trial court advised him:

"THE COURT: *** I'm sure you know, because you're a seasoned attorney, he has a case that goes ba[ck] to 2016 and he has gone through numerous attorneys, numerous. And the Court is very anxious to get the case disposed of. Just so you know the history of it, he's gone through numerous attorneys."

Counsel expressed appreciation for the admonishment. The public defender was permitted to withdraw, and private counsel was permitted to file his appearance.

¶ 15     After a couple more years of motions, hearings, and other delays, a trial date was set for December 12, 2022. However, on December 6, 2022, the case was called, and the trial court explained that they were there because defense counsel had informed the court that he might be seeking a continuance, based on the trial court's ruling to allow the State to use STRmix DNA analysis. The court said that counsel wanted "to see if he could obtain an expert *** at taxpayer's expense." Counsel replied that he was not yet sure if he would need government funds, but he was still seeking leave to file a motion "to continue for the purpose of seeking an expert." The trial court said that the court was confused because they had already held a hearing on this topic, and that the court had made its ruling. Counsel explained that he was "pursu[ing] an expert to assist [counsel] in confronting this critical evidence."

¶ 16     The court noted that a jury trial had originally been set for six months earlier. However, since that time, the court had set a schedule for all motions to be filed, and both sides had "argued extensive motions." "The State had then divulged some additional testing" that had not been available at the time of the offense. After an oral objection by the defense, the court had instructed defense counsel to put his objections in writing, which was done, and the State

had responded with hundreds of pages of a transcript from a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) in another case regarding STR mix, which the court had reviewed. The trial court had then made a finding in writing, first summarizing all the testimony in that prior *Frye* hearing and then ruling the evidence admissible. The trial court noted that, based on its own independent review, it had found that STRmix is "generally acceptable in the scientific community."

¶ 17    The trial court was puzzled why counsel had waited. The court stated that its "issue" was that "this case has been pending for so long. It's six years old." The court noted that defense counsel was not seeking to reopen the *Frye* hearing. Counsel agreed but said that he wanted to dispute the State's findings in this case and that he had found a possible expert whom he named. Counsel explained that this witness was not going to say that STRmix was "junk science," but rather this witness stressed that, with this type of analysis, one had to examine the data in the case "to see if their likelihood ratio and verbal qualifier are accurate." Counsel requested a trial date in February 2023, to permit the witness to review all the data that the Illinois State Police had used and also because he was having a hip replacement in January.

¶ 18    The court said that if they set the trial for February 2023, it wanted to make sure that it was "a date that everyone could come." The court stated that it "can't see any other reasons for continuing." The assistant state's attorney (ASA) confirmed his availability for February 24, 2023, and stated that the State's witnesses had been flexible, such that he did not anticipate problems. The court observed that it wanted to try the case, but that it found what defense counsel was requesting was reasonable. The court said that it would hold the continuance motion in abeyance until December 12, so that the parties could check with their witnesses and confirm the February 24 trial date.

¶ 19    On December 12, 2022, defense counsel requested a Rule 402 conference. See Ill. S. Ct. R. 402 (eff. July 1, 2012). The Rule 402 conference concerned both this case and another case pending against defendant, involving the unlawful use or possession of a weapon by a felon. The court informed defendant that, if convicted of all the charges in this case, and not counting the gun case, defendant would have to serve over 100 years before he was eligible for parole. The court issued a recommendation[1] of a total of 33 years for both cases. The cases were continued for a month to permit defendant to think about the recommendation. The court informed defendant that, if he opted for a trial, they had a date and a whole week set aside for it in February and "we're all set to go."

¶ 20    On January 18, 2023, when the parties convened again in court, the court informed defendant that, if he accepted the plea recommendation, he would have to register for life as a sex offender and that, when defendant was scheduled to be released, he would be evaluated at that time to see if he met the criteria for involuntary civil commitment as a sexually violent person. Defendant rejected the recommendation.

¶ 21    While the trial court and the attorneys were confirming that they were picking a jury on February 24, 2023, defendant indicated that he wanted to speak to the court. When the court asked defense counsel if he wanted his client to speak to the court, counsel said: "I don't think I can stop him, Judge." Defendant stated that his counsel was a "great lawyer" and "an awesome lawyer" but that defendant was "not comfortable" with counsel representing him at a trial. Defendant claimed that he had "been strung along" since December that "the lady" expert was going to "get the paperwork" she needed so she could "come in" and "do her job"

---

[1] The record reflects that the judge made an offer after the Rule 402 conference. However, Rule 402 states that at the end of the conference, the judge may make a recommendation as to what the sentence should be. Ill. S. Ct. R. 402(d)(1) (eff. July 1, 2012)Therefore, we will refer to the "recommendation" as opposed to "offer."

as an expert, but "now it's like, do I have $2,500." The court interrupted and asked if the $2,500 was for an expert, and defendant confirmed that it was.

¶ 22    The court then asked: "Is there any issue besides the expert that's making you uncomfortable with your attorney?" Defendant said that he felt like his counsel was not giving his case "[h]is all." The court asked defendant to "[b]e specific" about why defendant felt that his counsel was not giving the case his all. Defendant responded: "Because he has strategies. Hearing the strategies and how we [are] going to fight this, I'm not comfortable." The court asked: "What strategy are you not comfortable with? What's the strategy that's making you uncomfortable?" Instead of naming a strategy, defendant replied that it was "[t]he fight[,] period, [Judge] Petrone." The court probed again: "Is there anything else that you want to tell me about why you're not comfortable or confident with your attorney?" Defendant replied: "That's it." The court asked defense counsel if he wanted to say anything in response, and he declined.

¶ 23    The court said that it was going to review on the record the history of defendant's case, noting that the case began on September 15, 2016, and that it was now January 8, 2023. The judge noted that she came into the case in 2017, when defendant was represented by an assistant public defender (APD). The State filed a motion to compel defendant to give a buccal swab. Two years after the case began, the State filed a long-form answer. The APD filed a motion to bar evidence of other crimes and also motions to quash arrest and to suppress the identifications. A hearing was held regarding the arrest and identifications, and the court issued written orders on May 20, 2021. On January 13, 2022, argument was heard on the other-crimes motion, with current private counsel representing defendant. The motion was denied in a written order on February 10, 2022. On April 1, 2022, the State filed a supplemental discovery

answer and a motion *in limine* regarding the victims' statements to medical personnel. Argument was heard on May 20, 2022, and the trial court issued a written ruling on June 6, 2022, allowing the statements. Trial was set for June 27, 2022.

¶ 24        However, on June 27, 2022, defense counsel said the defense was still waiting for the State to tender a new lab report, and the case was continued to July 29, 2022, when the State filed a rape-shield motion. Defense counsel said he was going to object to further DNA testing. The objection was set for argument on September 15, 2022, and trial was set for December 12, 2022. On September 15, 2022, defense counsel objected to the STRmix DNA testing, and the court told him to put the objection in writing, which he did, filing a written motion on October 28, 2022. The State filed a written response in November 2022, and a hearing was held. After the court found that the method was generally accepted in the scientific community, defense counsel sought a continuance for another expert to review the material, which was granted even though the case was set for trial. The court stated that it was not giving another continuance "based on that."

¶ 25        After reviewing the history of the case on the record, the court found that "there's no issue to go further with any Krankel hearing here." The court found that counsel had been doing a "stellar job in representing" defendant. In response, defendant said: "I don't want him to be my attorney no more." The court stated that the case was going to trial on the date set, that "[i]f you have another attorney that's ready, willing an[d] able to go trial that's fine," but that the court was not continuing the case. The court found that defendant had "gone through" several different APDs before he hired a private attorney and that this private attorney "has done everything he can."

¶ 26        The court then gave defendant another chance to speak, noting that so far all the court had heard was that defendant was "not comfortable" with counsel. The court asked again if there was anything else. Defendant said that "certain things" were "kept away" from him. The court asked: "What are those things?" Defendant clarified: "it wasn't about you letting Star mix in. I wasn't talking about that part." Defendant pointed to "the fact" that counsel and the State came to an agreement about a deal and said that the court was "not going to go higher than that" but then the court did. Defendant asserted that "like certain things[.] I feel like I'm being strung along."

¶ 27        The court asked if defendant had another lawyer that he wanted to hire and, if so, who it was. Defendant said he had to talk to his family, and he did not know the name of a lawyer. Defendant said: "I'm not asking for a continuance." However, defendant said he did want new representation. When the court asked if defendant expected the court to pull someone out of the air, defendant replied: "No, I don't want you to do it. That's my job." Defendant asked if they could take a minute for counsel to call his mom, and the court said: "Sure." After a short recess, counsel reported that he had called defendant's mother who reported that she had spoken to two attorneys about representing defendant, but she did not know their names because she was at work. Although defendant stated that he was not asking for a continuance, the court stated that defendant did not have another attorney who was ready, willing, and able to do the trial on the date set and that defendant's motion for a continuance was denied.

¶ 28        The trial court stated that the reasons for its denial were that it had already permitted defendant to go from public defenders to substitute private counsel, that the case was over six years old and a trial date had been set, that the court had given counsel whatever continuances he wanted to get ready, that all the issues were now resolved, and that defendant had been in

county jail for years and was entitled to a disposition. The court said that it would hold the plea recommendation open until January 31, and defendant asked the court to "repeat again" that "last part," which the court did.

¶ 29     On January 31, 2023, defendant again rejected the recommendation. The trial court confirmed with the parties that all pretrial motions had been resolved, that the jury room was available, and that a venire reserved for February 24, 2023. The court set February 14, 2023, as a "check date," in case any "last minute issues" came up. Defendant confirmed that he wanted a jury trial.

¶ 30     On February 14, 2023, the ASA stated that all the State's witnesses were under subpoena, that they had all been contacted, and that the ASA anticipated answering "ready" on February 24. Defense counsel also stated that he "anticipate[d] answering ready." However, counsel also informed the court that defendant's family had told him that they had "hired someone else," but that counsel had not "seen" or "heard from anybody." Defendant stated that the new counsel, who he named, was "supposed to be here today." The court observed that "[n]obody's here" and adjourned to February 24, 2023.

¶ 31     On February 24, 2023, the trial court again recited the history of the case and then stated:

> "THE COURT: Earlier this week, an attorney, who I don't know who he is, went to the clerk's office and filed a motion for discovery and an appearance. Walked into this courtroom when the case was not on call and announced he was just getting a date on a case, and it was this case. He wasn't the attorney of record. The case wasn't on call. His name was [attorney's name]. I told him he was not filing an appearance here. The case was set for trial. The case was almost eight years old."

12

The court found that this was "a stalling technique to thwart the effective administration of justice." The court noted (1) that the case had been going on since 2016, (2) that a number of different motions had been litigated and all the motions were done, (3) that this judge had allowed defendant to switch once already from the public defender to current private counsel, (4) that she had granted every prior request for a continuance by counsel, and (5) that this was the third time the case was set for a jury trial.

¶ 32    Defense counsel then stated that defendant had informed counsel that he no longer wished counsel to represent him, and based on that, counsel moved to withdraw. The trial court responded: "If he wishes to go *pro se*, he's going to trial today." The court noted: "Venire, for the record, is in the hallway waiting to come into the courtroom." The court reiterated the charges and sentencing ranges and advised defendant of the issues and problems with self-representation. When the court asked defendant if he understood there would be no continuance, defendant did not respond. The trial court ruled: "As we've been waiting a few minutes, there has been no response. The request to proceed *pro se* is denied." The court also denied counsel's request to withdraw and found:

> "THE COURT: I find he's making a rash decision because he's trying to stall for a continuance because the State has answered ready. That thwarts the effective administration of justice. That makes a mockery of the Court proceedings. This is the third time the case is set for trial."

Defendant asserted "[t]hat's not the attorney that I—that I paid for" and that he had fired his current counsel in January. The court noted that counsel had been his attorney for years. The parties then discussed various preliminary matters, and the case proceeded to trial.

¶ 33    On this record, we can find no abuse of discretion. This case raises an interesting question of how many times a defendant must be allowed to switch counsel and whether we use the same factor-analysis for each attempted switch. *Tucker*, 382 Ill. App. 3d at 920 (setting forth the factors to consider). The trial court found that defendant had "gone through" several different APD's before then switching to the private counsel, who he then wanted to dismiss. However, even leaving that question aside, we can find no abuse here.

¶ 34    Defendant argues that the five *Tucker* factors establish an abuse of discretion in this case. The first *Tucker* factor is "whether defendant articulates an acceptable reason for desiring new counsel." *Tucker*, 382 Ill. App. 3d at 920. In his appellate brief, defendant argues that his articulated reason, given on January 18, 2023, was that he would be forced to pay $2500 for an expert to address the STRmix DNA issue since he had private counsel instead of a public defender and that, if he could not pay, he would have no expert. Defendant's appellate brief adds that defendant felt that his counsel was not giving his "all" and that defendant did not agree with counsel's "strategies."

¶ 35    As for the reason related to the expert, the record establishes that defendant's counsel was aware that he could apply for government funds for an expert to testify concerning the STRmix DNA analysis. However, counsel informed the court on December 6, 2022, that he was not yet sure if he would need those funds for such an expert. In addition, later in the proceeding on January 18, 2023, when asked to specify what the "things" were that were bothering him, defendant clarified that "it wasn't about you letting Star mix in. I wasn't talking about that part." Based upon the stated potential of government expert funds and defendant's clarification that he was not talking about the DNA analysis, we cannot find an abuse of discretion on this basis.

¶ 36    With respect to defendant's claim that he did not agree with unspecified strategies and did not feel that his attorney was giving the case his "all," the court found both that the claim was too general and that his attorney was "stellar" and had "done everything he can." Counsel had represented defendant for 2½ years without complaint, and defendant himself conceded that counsel was both "great" and "awesome." See *People v. Terry*, 177 Ill. App. 3d 185, 190-91 (1988) (trial court did not abuse its discretion in denying motion for a continuance to substitute counsel, where the defendant was "represented by counsel for almost four months and at no time prior to the day of trial complained about his representation"); *People v. Burrell*, 228 Ill. App. 3d 133, 143 (1992) (the trial court did not abuse its discretion in denying defendant's motion on the day of trial to substitute counsel, where eleven months was "ample time to retain private counsel"). Given the deferential standard, we cannot find an abuse of discretion based on such a vague claim.

¶ 37    The second *Tucker* factor is "whether the defendant has continuously been in custody." *Tucker*, 382 Ill. App. 3d at 920. While defendant was out on bond for three years, he had been in custody for most of the seven years that the case was pending. The trial court observed: "I can't keep you sitting in the County Jail." Further, after seven years and the resolution of all issues, a disposition was due for "the orderly process of judicial administration." *Terry*, 177 Ill. App. 3d at 190 ("At what point a defendant's right to select counsel unreasonably interferes with the orderly process of judicial administration *** lies within the sound discretion of the trial court."); *Tucker*, 382 Ill. App. 3d at 920. Thus, this factor does not favor finding abuse in this case.

¶ 38    The third *Tucker* factor is whether defendant "has informed the trial court of his efforts to obtain counsel." *Tucker*, 382 Ill. App. 3d at 920; *Segoviano*, 189 Ill. 2d at 245 ("the diligence

15

of the movant" should be considered). New counsel must be ready, willing, and able to appear on defendant's behalf. *Tucker*, 382 Ill. App. 3d at 920; *Segoviano*, 189 Ill. 2d at 245 ("it is well established that a trial court will not be found to have abused its discretion in denying a motion for substitution of counsel in the absence of ready and willing substitute counsel"). On January 18, 2023, when defendant first asked to be permitted to switch counsel, defendant did not know the name of a particular attorney, and his mother confirmed that she had been speaking with two different possible attorneys. On February 14, 2023, counsel reported that defendant's family had told him they had hired someone else but that he had not seen or heard from anyone. Defendant indicated that the new counsel, who he named, was "supposed to be here today." However, as the court observed, "[n]obody's here," and the matter was marked ready for trial in 10 days. On February 24, 2023, with the venire waiting in the hallway to begin a jury trial, the court stated that, earlier that week, the substitute counsel had "[w]alked into the courtroom when the case was not on call and announced he was just getting a date on [this] case." Substitute counsel had filed an appearance and a motion for discovery in the clerk's office. The court stated that it had "told him he was not filing an appearance." The court explained that it was not restarting the clock all the way back to the discovery stage. This factor does not fall in favor of finding abuse, where defendant's new counsel failed to promptly notify prior counsel or the court, where the record discloses no attempt to effect a smooth transition from existing counsel, where he failed to appear at a scheduled court proceeding at which he was expected, and where the defense concedes on appeal that substitute counsel was not ready or able to appear on defendant's behalf in the stage of litigation that the case had reached. *People v. Harrison*, 2022 IL App (1st) 161172-U, ¶ 58 (new counsel did not stand ready, willing and able to appear when her appearance depended on multiple continuances).

¶ 39    The fourth and fifth factors are whether defendant "has cooperated with current counsel; and the length of time defendant has been represented by current counsel." *Tucker*, 382 Ill. App. 3d at 920; *Burrell*, 228 Ill. App. 3d at 142 (a factor to be considered is "whether [the defendant] has cooperated with appointed counsel even though dissatisfied with that counsel"). The record contains no evidence that defendant refused to, or was unable to, cooperate with current counsel over the 2½ years of counsel's representation. On the one hand, these factors do not suggest a difficulty created by defendant; on the other hand, they also demonstrate no difficulty with counsel. Thus, these factors do not favor an abuse finding either. Compare *Burrell*, 228 Ill. App. 3d at 143 (no abuse of discretion in denying defendant's motion on the day of trial to substitute counsel, where eleven months was "ample time to retain private counsel") with *Adams*, 2016 IL App (1st) 141135, ¶ 17 (abuse of discretion in denying defendant's motion on the day of trial to substitute counsel, where "the case had been pending for only 70 days").

¶ 40    We have thus reviewed the *Tucker* factors as defendant requested, and we can find no abuse of discretion based on them.

                              II. Identification Procedure

¶ 42    On appeal, defendant argues that the identification procedures were unduly suggestive. For relief, defendant seeks a limited remand for an independent-basis hearing at which the State would have the burden of proving that the victims' identifications were independently reliable. *People v. Clifton*, 2019 IL App (1st) 151967, ¶¶ 83-84 (although remanding in that case to allow the trial court to evaluate the independence of the witnesses' identifications in the first instance, the appellate court noted that a reviewing court "*may* consider the

17

independence of witness identifications for the first time on appeal if the record is sufficiently developed" (emphasis in original)).

¶ 43       In response, the State notes that defendant does not argue that the photo array itself was inherently suggestive but rather that the procedure was unduly suggestive. The State argues that, since defendant failed to carry his burden to show suggestiveness, there was no need to inquire further. For the following reasons, we agree.

¶ 44                                    A. Two-Part Inquiry

¶ 45       Courts utilize a two-part inquiry to decide whether an identification procedure so tainted a witness's identification that the admission of the identification at trial violated the defendant's due process rights. *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 22. First, the court must determine if the procedure was, in fact, suggestive. *Ortiz*, 2017 IL App (1st) 142559, ¶ 22. In this first step, it is the defendant who carries the burden of establishing that the pretrial identification procedure was impermissibly suggestive. *Ortiz*, 2017 IL App (1st) 142559, ¶ 22. Second, if the court finds that the defendant has satisfied his burden, then the court proceeds to determine whether the witness's subsequent identification testimony was so tainted by the procedure as to make the identification unreliable. *Ortiz*, 2017 IL App (1st) 142559, ¶ 22. For this second step, the burden switches to the State to prove an independent basis for the identification. *Clifton*, 2019 IL App (1st) 151967, ¶ 83.

¶ 46       When reviewing the denial of a suppression motion, we accord great deference to a trial court's findings of historical fact. *People v. Luedemannn*, 222 Ill. 2d 530, 542 (2006). We will reverse a finding of historical fact only if it is against the manifest weight of the evidence. *Luedemannn*, 222 Ill. 2d at 542; *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). However, we review *de novo* "the ultimate question" posed by a defendant's legal challenge to the denial of

his motion. *Sorenson*, 196 Ill. 2d at 431. This means that a reviewing court "remains free to undertake its own assessment of the facts in relation to the issues." *Luedemannn*, 222 Ill. 2d at 542.

¶ 47                         B. Alleged Suggestiveness Based on Three Statutory Violations

¶ 48        To satisfy his burden to show suggestiveness, defendant argues on appeal that three statutory violations establish that the procedures were suggestive.

¶ 49        Our state's Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107A-0.1 *et seq.* (West 2024)) provides requirements for the proper conduct of identification procedures in statutory sections commonly referred to as "the Lineup Statute." *In re N.A.*, 2018 IL App (1st) 181332, ¶ 23. Section 107A-0.1 of the Code defines the word "Lineup" to include a photo array or a live lineup. 725 ILCS 5/107A-0.1 (West 2024). Thus, although the statute uses the word "lineup" and our case involved a photo array, the statute's requirements apply to our case. First and foremost, section 107A-2 provides that "[a]ll lineups shall be conducted using one of the following methods." 725 ILCS 5/107A-0.1, 107A-2(a) (West 2024). The first method listed is by "[a]n independent administrator." 725 ILCS 5/107A-2(a)(1) (West 2024). In the case at bar, independent and different administrators were used for each identification. Further, the statute provides that there is no preference for a sequential display over a simultaneous one, such as the array used in our case, and no preference for a live line up over a photo array, such as the one used in our case. 725 ILCS 5/107A-2(b), (c) (West 2024).

¶ 50        In the case at bar, defendant alleges that the procedures failed to comply with three additional requirements and that the trial court failed to consider this lack of compliance when evaluating suggestiveness. In support, defendant notes that the statute provides that the "[f]ailure to comply with any of the requirements of this Section shall be a factor to be

considered by the court in adjudicating a motion to suppress an eyewitness identification." 725 ILCS 5/107A-2(j)(1) (West 2024). This paragraph further provides that "[t]his paragraph (1) makes no change to existing applicable common law or statutory standards or burdens of proof." 725 ILCS 5/107A-2(j)(1) (West 2024).

¶ 51　　　　First, defendant alleges that the State failed to comply with the following statutory requirement: "If there are multiple eyewitnesses, subject to the requirements in subsection (a) of this Section [requiring independent administration] and to the extent possible, the suspected perpetrator shall be placed in a different position in the lineup or photo array for each eyewitness." 725 ILCS 5/107A-2(f)(4) (West 2024). A "different" photo array means different from a prior one and, thus, affects only the second identification here. As defendant notes, it is undisputed that both victims viewed the same photo array.

¶ 52　　　　Second, defendant argues a violation of the following requirement:

> "When practicable, the lineup shall separate all eyewitnesses in order to prevent the eyewitnesses from conferring with one another before and during the lineup procedure. If separating the eyewitnesses is not practicable, the lineup administrator shall ensure that all eyewitnesses are monitored and that they do not confer with one another while waiting to view the lineup and during the lineup." 725 ILCS 5/107A-2(f)(1) (West 2024).

This statutory section concerns conferring "before" or "during" the lineup, so again the alleged violation concerns only the second identification here or L.B.E.'s identification. It is undisputed that the two victims did speak after the first identification and before the second one.

¶ 53　　　　Third, defendant argues a violation of the following requirement:

"(h) Unless it is not practical or the eyewitness refuses, a video record of all lineup procedures shall be made.

(1) If a video record is not practical or the eyewitness refuses to allow a video record to be made:

(A) the reasons or the refusal shall be documented in the official report required ***

(B) an audio record shall be made, if practical; ***

***

(2) If an audio record is not practical, the reason shall be documented in the official report ***." 725 ILCS 5/107A-2(h) (West 2024).

In the case at bar, the witnesses refused both a video and an audio recording, and the reasons for said refusals were documented in the police report. Defendant argues that the witnesses and the police did not testify to any impracticality, thereby implicitly arguing that a witness's refusal does not qualify as an impracticality.

¶ 54                                    C. First Procedure

¶ 55            With respect to the suggestiveness of the first procedure, defendant's only claim on appeal is the lack of an audio recording. In support of this claim, he cites the appellate court case of *N.A.*, 2018 IL App (1st) 181332, ¶ 34, where the appellate court observed that the statute "contains no language that would allow an eyewitness to refuse an audio recording." However, the appellate court went on to find that the violation had no effect on the reliability of the identification and that, in any event, the noncompliance was inconsequential for several reasons, including that the defendant failed to file a motion to suppress. *N.A.*, 2018 IL App (1st) 181332, ¶¶ 35-36.

¶ 56    While defendant filed a motion to suppress in the case at bar, he failed to name this as a ground in either his written motion or in his opening or closing statements at the hearing. Defendant argued, specifically, the use of the same photo array and the witnesses' conferring between identifications but failed to say anything about the lack of an audio recording. It is well established that "an objection on specific grounds forfeits assignments of error on other grounds not specified." *People v. Hayes*, 319 Ill. App. 3d 810, 818-19 (2001). Further, the lineup statute itself provides that motions alleging a failure to comply with it "shall be in writing" and shall identify the "facts showing how the identification procedure was improper." 725 ILCS 5/107A-2(j)(1) (West 2024). Thus, pursuant to the statute, and as the State argues, this issue is forfeited for our consideration. Although the State's appellate brief asserted forfeiture, defendant's reply brief did not seek plain-error review. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("when a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review"). Since this was the sole issue raised affecting the first procedure, we find no basis asserted to question the first procedure's validity. *People v. Roberts*, 2020 IL App (1st) 172262, ¶ 32 ("the statute does not require suppression of a witness's identification to remedy a violation of the procedures outlined therein").

¶ 57                              D. Second Procedure

¶ 58    With respect to the second procedure, defendant alleges, and it is undisputed, (1) that defendant was in the same position in the photo array shown to both victims and (2) that the victims spoke between identifications. 725 ILCS 5/107A-2(f)(4) (West 2024) (to the extent possible, "the suspected perpetrator shall be placed in a different position in the lineup or photo array for each eyewitness"); 725 ILCS 5/107A-2(f)(1) (West 2024) ("If separating the

eyewitnesses is not practicable, the lineup administrator shall ensure that all eyewitnesses are monitored and that they do not confer with one another while waiting to view the lineup and during the lineup.").

¶ 59      At the suppression hearing, Detective Arthur Davis testified that, on August 3, 2016, he conducted the photo array for victim B.M. as an independent administrator, which he testified meant that he had "no knowledge of the case." Detective Davis admitted that, after the identification, he failed to tell B.M. to refrain from talking to others about her identification. At the hearing, Detective Thomas Doherty testified that on August 4, 2016, he was the independent administrator conducting the photo array for victim L.B.E. Prior to the procedure, he was handed a manila folder containing, among other things, a lineup advisory form and the array. Detective Doherty could not specifically recall whether, after the procedure, he told L.B.E. not to discuss her identification with others. However, Detective Doherty did testify: "What I do recall is every time I administer as an independent administrator, we read through the entirety of the form together, so we understand it, and I complete the form. I can't recall if I specifically said that or not."

¶ 60      At the suppression hearing, B.M. testified, consistent with Detective Davis's testimony, that he did not tell her not to discuss her identification with anyone. B.M. testified that, after her identification, she texted the other victim in the case, L.B.E. B.M. testified that, in the text messages, "I told her, it wasn't as hard as I thought." However, B.M. did not tell L.B.E. the position of the photo that B.M. identified, give any description of the person, or mention his clothing or hairstyle. B.M. provided no details about the identification. At some point, while they were texting, L.B.E. said she would call B.M. When L.B.E. called, they did not have a

further discussion about the identification. On August 4, 2016, L.B.E. texted B.M. to let B.M. know that L.B.E. had done her identification. L.B.E. did not testify at the suppression hearing.

¶ 61　　　　On May 20, 2021, the trial court issued a two-page, single-paced typed order detailing its findings. First, the trial court described the familiar "two-part inquiry," where a defendant has the burden on the first step, and the State has the burden on the second. Next, the trial court reviewed the evidence and made credibility findings, stating with respect to the victim: "Her testimony is unimpeached. This court found her to be credible."

¶ 62　　　　At one point, in the typed order, the paragraph appears to inadvertently switch the initials of the victims. The paragraph correctly states that "BM" testified but then says "[a]fter the procedure, LBE texted BM: 'It wasn't as hard as I thought,' "—when, it was in fact the other way around, with B.M. texting L.B.E. Nevertheless, this typo does not diminish the trial court's credibility finding, where the court clearly and unmistakably found that the one victim who testified was credible when she swore that "[t]hey did not speak about the identification."

¶ 63　　　　On appeal, defendant argues that B.M.'s testimony about a lack of detail was inherently unbelievable. However, this was the credibility finding that defendant had hoped for but that the trial court did not make. A trial court's factual findings regarding live witnesses are entitled to great deference on appeal. *People v. Morgan*, 2025 IL 130626, ¶ 52 (deference is paid to a trial court's factual findings where the trial court "heard and observed the live witnesses' testimony" placing it "in a superior position" to evaluate their testimony).

¶ 64　　　　Defendant argues on appeal that the trial court failed to consider the statutory violations as factors, as the statute itself requires.[2] 725 ILCS 5/107A-2(j)(1) (West 2024) ("Failure to

---

[2]In his initial appellate brief, defendant argued that the statute required a trial court to consider noncompliance and that "[t]he court did not do that in this case." However, in his reply brief, he argued that "the State acknowledged that the court did *in fact* consider noncompliance with the statutory

comply with any of the requirements of this Section shall be a factor to be considered in adjudicating a motion to suppress an eyewitness identification \*\*\*.") First, defendant specifically argued the two statutory factors to the trial court in his suppression motion and in his oral argument at the suppression hearing, and we presume the court took them into account as factors. *People v. Chatman*, 2016 IL App (1st) 152395, ¶ 65 (the trial court is presumed to know and apply the law). Second, the trial court's order made written findings with respect to both factors. With respect to the statutory requirement that the suspect's position should be switched in a subsequent photo array, the trial court found: "Importantly, there has been no showing that BM even knew whether the same photo array was going to be shown to LBE the next day." With respect to the statutory requirement of taking steps to ensure that the witnesses do not confer while waiting to view the array, the trial court found:

> "Although there was communication between the time BM viewed the photo array on August 3, 2016 and the time LBE viewed the photo array on August 4, 2016, and it would have been preferential not to have had such communication, there has been no showing of any improper communication between them."

Thus, on review, we can find no violation of the statutory admonishment to consider statutory violations as factors. 725 ILCS 5/107A-2(j)(1) (West 2024) ("Failure to comply with any of the requirements of this Section shall be a factor to be considered in adjudicating a motion to suppress an eyewitness identification \*\*\*.").

¶ 65 Further, for the reasons stated by the trial court, we cannot find suggestiveness based on the arguments advanced by defendant, namely, (1) the lack of a position change in the array

procedure." (Emphasis added.) Thus, it is unclear whether defendant retracted this argument. However, in any event, we do not find the argument persuasive, for the reasons that we explain in the text above.

and (2) the conversation between the victims prior to the second procedure. As the trial court found as historical fact based on live testimony, there was no evidence that the victims knew the array was the same or that they had discussed the identification. Thus, defendant has failed to carry his burden to show suggestiveness.

¶ 66 Defendant does not argue suggestiveness based on other factors, nor could he. The procedures were administered by independent administrators unfamiliar with the case, the administrators were different for each procedure, the procedures occurred on different days in different locations, and no allegations of suggestiveness are made or apparent regarding the array itself. Thus, given the trial court's credibility findings to which we owe deference, we can find no suggestiveness here.

Lastly, defendant argues that the trial court misapplied the law when, at the end of the order, the trial court found that defendant failed to meet his burden to show the array was unduly suggestive or the identification was unduly reliable. Defendant notes, correctly, that he had the burden only on the first step but not on the second. However, since the trial court accurately stated the law in some detail earlier in the same order, we do not find this misstatement telling. In any event, the trial court rightly observed in both places in its order that defendant bore the burden of establishing that the array was suggestive, and that is as far as we need to go, for we found that the claims that defendant made regarding the second procedure do not satisfy his burden of proving suggestiveness. *Ortiz*, 2017 IL App (1st) 142559, ¶ 27 (the appellate court affirmed the trial court without considering independent basis, where the appellate court found that the procedure was not unduly suggestive).

¶ 67 For the foregoing reasons, we can discern no need to remand, as defendant requests, for an independent basis hearing.

¶ 68                                    III. Sentence

¶ 69        On appeal, defendant claims that his 96-year prison sentence is excessive. Defendant claims (1) that the trial court did not give sufficient weight to mitigating evidence such as his youth, (2) that the trial court considered an improper factor of his not admitting guilt, and (3) that the sentence that the trial court imposed does not reflect an appropriate balancing of rehabilitation and retribution. Defendant asks this court to reduce his sentence or remand for resentencing.

¶ 70        The State responds that defendant's convictions required consecutive sentences and that all the individual sentences fell within statutory guidelines, thereby making them presumptively valid. The State notes that the trial court declined to sentence defendant on the three sex counts, which alleged a firearm enhancement, and instead merged those counts into the counts regarding the same acts that did not allege the 15-year firearm enhancement. Further, the State argues that the sentences were not manifestly disproportionate where defendant abducted two victims at gunpoint and forced them to submit to multiple sex acts against their will. For the following reasons, we can find no abuse of discretion by the trial court.

¶ 71        On August 4, 2023, the court imposed sentences on six counts of aggravated criminal sexual assault (ACSA) and two counts of aggravated kidnapping. Both offenses are Class X felonies with a sentencing range of 6 to 30 years. 730 ILCS 5/5-4.5-25(a) (West 2024). The State observes, and defendant does not dispute, that the ACSA sentences must be served consecutively and must be served consecutive to the kidnapping sentences. Thus, if the trial court had imposed the minimum for each of the eight counts, the total would have been 48 years. If the court had imposed the maximum, the total would have been over 100 years. The

maximum aggregate of consecutive terms is statutorily capped at 120 years. *People v. Myrieckes*, 315 Ill. App. 3d 478, 482 (2000).

¶ 72     Specifically, the trial court imposed an eight-year sentence for the kidnapping of B.M. and an identical eight-year sentence for the kidnapping of L.B.E. The court imposed one 20-year sentence for an ACSA count for B.M. for penis to sex organ contact and similarly imposed one 20-year sentence for an ACSA count for L.B.E. for penis to sex organ contact. The court imposed 10-year sentences for the remaining four ACSA counts, with two relating to B.M. and two relating to L.B.E. Of those four counts, two were for penis to sex organ contact and two were for penis to mouth contact. The sentences for the counts relating to B.M. totaled 48 years, and the sentences for the counts relating to L.B.E. totaled 48 years. Since all sentences were ordered to run consecutively, the cumulative sentence was 96 years.

¶ 73     As the State notes, there were additional 15-year firearm enhancements, which the court effectively avoided by merging those counts into counts without the enhancement. Counts XXV through XXX charged ACSA while "armed with a firearm," while counts XIII through XVIII did not have that language. The "armed with a firearm" language meant that defendant, if sentenced on those counts, would have to receive a 15-year mandatory firearm enhancement on each count. 720 ILCS 5/11-1.30(d)(1) (West 2024) ("A violation of subsection (a)(8) is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court."); 720 ILCS 5/11-1.30(a)(8) (West 2024) ("the person is armed with a firearm"). Instead, the court found that the two sets of counts were for the same acts and merged the firearm counts into the counts without that language, thereby effectively avoiding imposition of the enhancements. If the trial court had sentenced on the firearm counts, defendant's cumulative sentence would have reached the 120-year statutory cap. By this

28

merger, defendant's sentence was effectively reduced 24 years, by that we mean the statutory cap (120) minus the sentence given (96). *Myrieckes*, 315 Ill. App. 3d at 482.

¶ 74   "It is well settled that the trial court has broad discretionary powers in imposing a sentence ***." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Our supreme court has stressed that a reviewing court should pay "great deference" to the trial court's decision. *Stacey*, 193 Ill. 2d at 209. We owe this deference "because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence." *Stacey*, 193 Ill. 2d at 209. The trial court is in a better position because, being face to face, it can better assess factors such as "the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Stacey*, 193 Ill. 2d at 209. "Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Stacey*, 193 Ill. 2d at 209.

¶ 75   Nonetheless, "such discretion is not without limitation." *Stacey*, 193 Ill. 2d at 209. "[A] sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. For example, in *Stacey*, our supreme court reduced two 25-year sentences for criminal sexual abuse to 6 years each, where defendant had "momentarily grabbed the breasts of two young girls, who were fully clothed at the time." *Stacey*, 193 Ill. 2d at 210-11. Although the sentences were within the statutory guidelines, our highest court found that the trial court had abused its discretion where "the level of seriousness of the offenses [did] not warrant 25-year sentences." *Stacey*, 193 Ill. 2d at 211.

¶ 76        In the case at bar, of the eight sentences, six of them, or the vast majority, were for 8 or 10 years, which was far closer to the 6-year minimum than the 30-year maximum. Yet, defendant directs our attention to the two counts sentenced at 20 years each and argues that there was no reason given for a higher sentence for these two counts. The State responds that a trial court is not required to explain its reasons. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 18 (a trial court is not "required to specify on the record the reasons for the sentence imposed"). We cannot find an abuse of discretion in imposing a higher sentence for the first act of vaginal penetration as opposed to the second, and the 20-year sentence was already an effectively reduced sentence since the court exercised its discretion to sentence on the non-firearm count for this act. Further, we observe that the conduct here is a far cry from the "momentar[y]" grab in *Stacey*, which caused our supreme court to find an abuse of discretion, but which still merited the six-year minimum. *Stacey*, 193 Ill. 2d at 210-11.

¶ 77        Defendant claims that it is implicit from the trial court's comments that she held his assertion of innocence against him when fashioning a sentence. Defendant argues that it was implicit in her comment when she observed that, in his allocution, "he's talking about no justice and he didn't do this." However, this remark simply prompted the court to review the evidence at trial and the events it established. The events of the offense are indisputably a factor to be taken into account at sentencing.

¶ 78        Defendant also notes that the trial court observed that, "if you listen to the defendant he is a victim here," and he lacked "remorse[ ] for this crime." A sentencing court is instructed to consider whether "[t]he character and attitudes of the defendant indicate that he is unlikely to commit another crime." 730 ILCS 5/5-5-3.1(a)(9) (West 2024). It is well established that, to accomplish this task, a sentencing court is permitted to consider a defendant's "lack of

remorse as indicative of his character and [his] prospects for rehabilitation." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 29; *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 36 (a defendant's "lack of remorse" may "tellingly indicate his character and prospects for rehabilitation"); *People v. Ward*, 113 Ill. 2d 516, 529 (1986) (a lack of remorse may considered in determining an appropriate sentence so long as it is not "automatically and arbitrarily applied"). While a court may not impose a more severe sentence because a defendant refuses to abandon his claim of innocence, a sentencing court may consider a defendant's lack of remorse as it bears on his potential for rehabilitation. *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84.

¶ 79        In the State's appellate brief, the State argues that defendant apologized to his own family but not to the victims. That is not accurate. Immediately after apologizing to his own family, defendant stated "I don't know the family anything like that from the other side of the party, but I want to apologize to them." Thus, we will disregard that argument.

¶ 80        What defendant actually asserted was that the accusations against him were just "lies" and that "[t]his isn't justice." The trial court considered these remarks in the context of reviewing each statutorily listed ground for mitigation. "Factors in mitigation" are listed in section 5-5-3.1 of the Unified Code of Corrections (730 ILCS 5/5-5-3.1 (West 2024)), and the court stated, "I'll go through them all." When she arrived at factors (8) and (9), she read them out loud and commented:

> "THE COURT: "[(8)] The defendant's criminal conduct was the result of circumstances unlikely to recur, and [(9)] the character and attitudes of the defendant indicate that he is unlikely to commit another crime.

I look at those because on the one hand, it's very hard to be an accurate predictor of someone's future behavior. None of us have a crystal ball and people do change, but I'm also looking at the fact that when the defendant was on bond he allegedly was in possession of a loaded gun with a laser sight, and the defendant has had prior felony convictions and has not learned from those prior sentences.

I listened to what the defendant said and if you listen to the defendant, he is a victim here. And that character and attitudes do not indicate to me that he is remorseful for this crime."

The court then continued down the list of mitigating factors.

¶ 81    We observe that the court considered defendant's lack of remorse, not in the context of an aggravating factor, but in the context of not giving him credit for a mitigating factor. Based on the above, we cannot find an abuse of discretion, where the court considered defendant's lack of remorse while trying to figure out the character and attitudes that had prevented him "from learn[ing] from those prior sentences." As for his prior sentences, the presentence report indicated that defendant dropped out of high school when he was arrested shortly after his eighteenth birthday and charged with unlawful vehicular invasion. Less than a year after being arrested on that charge, he was arrested for aggravated unlawful use of a weapon in a vehicle (AUUW/V). On June 7, 2012, when he was 19 years old, he was sentenced to 7 years with IDOC for the vehicular invasion and to 1 year for the AUUW/V charge, to be served consecutively. However, only four years later, on August 8, 2016, he was arrested for the instant offense. While out on bond for the instant offense, he was arrested and charged with several weapons offenses, including AUUW for having a loaded gun in a vehicle. The trial

court did not abuse its discretion in finding, based on defendant's lack of remorse and criminal history, that the "unlikely to commit" mitigating factor did not apply here.

¶ 82    Lastly, defendant argues that the trial court failed to adequately consider additional mitigating circumstances, such as his youth, the eight certificates he had earned in prison, his close relationship with his family, and the fact that he had some work history prior to incarceration. At sentencing, the court did summarize the contents of the presentence investigation, which mentioned all of these points. In addition, shortly before imposing sentence, the court stated:

> "THE COURT: I am considering mitigation, however, that the defendant has earned some certificates while he was in jail. That he does have a loving relationship with his family and he has people who truly love him."

Defendant's appellate brief concedes that the sentencing court acknowledged his certificates and his close relationship with his family but argues that his "youth was never mentioned during sentencing." However, neither defendant nor his counsel suggested at sentencing that defendant's 23-year age at the time of the offense warranted a more lenient sentence. Defendant's motion to reconsider sentence did argue that defendant's 96-year sentence was "essentially a life sentence given the age" of defendant. However, a 96-year sentence would be a life sentence for almost anyone, at any age. That one line does not constitute an argument for greater rehabilitative potential for a young adult. We cannot find an abuse of discretion based on the trial court's alleged failure to consider *sua sponte* an argument that was not raised.

¶ 83    In sum, we cannot find that the sentencing court abused its discretion, where consecutive sentences were required by law; where the sentences were within the statutory range and most were close to the minimum; where the trial court declined to impose sentences

33

on counts requiring a sentence enhancement and chose to merge them instead into counts where enhancements were not required; where the trial court considered all the listed mitigating factors; where the trial court was not required to *sua sponte* consider the "youth" of a 23-year old defendant; and where the court was permitted to consider, among other factors, defendant's lack of remorse and his repeated weapons charges as it analyzed his character, attitude, and likelihood to commit other crimes.

¶ 84                                     CONCLUSION

¶ 85        In the case at bar, defendant claimed (1) that the trial court abused its discretion when it rejected his request, made shortly before trial, to substitute a counsel who was not ready for trial in a case that had been pending for almost seven years; (2) that the trial court erred in denying defendant's pretrial motion to suppress the identification testimony of the two victims, where the police failed to instruct the witnesses not to speak with each other between identifications, where the police used the same photo array in both identification procedures, although conducted at different locations, on different days, and before different administrators, and where the witnesses did speak to each other before the second procedure, although not about the photo selected; and (3) that the trial court had abused its discretion in imposing a 96-year sentence, although consecutive sentences were statutorily required, the sentences were within the statutory range, and the trial court considered every listed factor in mitigation and sentenced in a way that avoided the imposition of firearm enhancements.

¶ 86        For the foregoing reasons, we do not find defendant's arguments persuasive and affirm.

¶ 87        Affirmed.

---

*People v. Minnis*, 2026 IL App (1st) 232494

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-13463; the Hon. Angela Munari Petrone, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Tasha-Marie Kelly, and Julie Riekse, Assistant State's Attorneys, of counsel), for the People. |